**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

ELIDE T. CARUTO,
        *Defendant-Appellant.*

No. 07-50041

D.C. No.
CR-06-00281-
WQH-1

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted
February 5, 2008—Pasadena, California

Filed May 12, 2008
Amended June 18, 2008

Before: Susan P. Graber and Marsha S. Berzon,
Circuit Judges, and Claudia Wilken,* District Judge.

Opinion by Judge Wilken

---

*The Honorable Claudia Wilken, United States District Judge for the
Northern District of California, sitting by designation.

6975

**COUNSEL**

Timothy A. Scott, San Diego, California, for the defendant-appellant.

Lawrence A. Casper and Neville S. Hedley, Assistant United States Attorneys, San Diego, California, for the plaintiff-appellee.

**ORDER**

The opinion filed on May 12, 2008, is amended as follows:

On slip opinion page 5230, delete footnote 2.

On slip opinion page 5241, lines 1-2, replace the sentence, "In fact, Caruto entered a continuing objection and was instructed by the court to stop objecting." with "In fact, Caruto entered four objections, all of which were overruled, to the prosecutor's discussion of Caruto's omissions, and those objections were not limited to 'discrete comments.' "

Any petitions for rehearing or for rehearing en banc will remain due on June 26, 2008.

## OPINION

WILKEN, District Judge:

Elide Caruto was convicted of one count of importation of cocaine in violation of 21 U.S.C. §§ 952 and 960 and one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841. She argues that her trial was fundamentally unfair because the district court allowed the prosecution to emphasize in its closing argument omissions in the brief post-arrest statement she gave before invoking her *Miranda* rights. This closing argument, she contends, improperly penalized her for cutting the interview short by exercising her *Miranda* rights. We hold that the prosecutor's argument, emphasizing omissions from Caruto's post-arrest statement that exist only because she invoked her right to counsel under *Miranda*, constitutes a violation of Caruto's right to due process.

I.

On the evening of February 6, 2006, Caruto was arrested at the Calexico, California port of entry when Customs and Border Protection officers discovered, in the gas tank of her truck, thirty-two packages containing a total of seventy-five pounds of cocaine. Late that night or early the next morning, Immigration and Customs Enforcement Special Agents Matthew Kelley and Tim Ballard interviewed Caruto.

After the agents read Caruto her *Miranda* rights, she signed a waiver and agreed to make a statement. Five to seven minutes later, Caruto invoked her right to counsel, and the interview ended. The only record of the interview is a set of

contemporaneous handwritten notes taken by Kelley. The notes were altered in at least two places.

At trial, the prosecution called Kelley as a witness. The prosecutor asked, "What did she tell you about the truck?" Kelley responded that Caruto told the agents "that she had lent the truck to unknown individuals in Mexicali, three to four weeks prior to her arrest. She said she received the vehicle on that date and that she was going to drive the vehicle to Los Angeles. She said she believed she was helping her friend." On cross-examination, Kelley testified that Caruto had denied knowledge of the cocaine in the truck.

Defense counsel also challenged Kelley's testimony that Caruto told him "that she was actually going to drive to LA." Counsel asked, "[I]sn't the fact that she said that she was told to go but that she wasn't really going?" Kelley replied, "I understood it that she was going to be driving to LA." Counsel confronted Kelley with his notes of the statement. Kelley originally recorded, "Received truck today. Was going to drive to LA to help friend," but crossed out the word "going" and replaced it with "told." Kelley conceded that, according to the revised notes, Caruto did not state "that she agreed to drive to LA or was going to drive to LA."

The notes also originally stated, "She let someone borrow the truck." Kelley had crossed out "someone" and replaced it with "unknown persons." Queried as to whether these persons were "unknown" to Caruto or to Kelley, Kelley agreed that "nowhere in those notes does it say Ms. Caruto didn't know who."

On redirect, the prosecutor asked, "[W]hen you were interviewing the defendant, did she say she was going home to Calexico?" Kelley testified that she did not. Kelley said Caruto related that "she was told to drive to Los Angeles." Ballard also testified he understood that "unknown individuals . . . had told her to drive that vehicle to Los Angeles."

The only other witnesses for the prosecution were the agent who referred Caruto to secondary screening at the border crossing, the agent who inspected Caruto's truck at secondary screening, the officer who discovered the cocaine in Caruto's truck, an agent who testified about the value of the cocaine, and an agent who testified about the manner in which the cocaine was concealed in the truck.

Caruto was the first defense witness. She testified that, the night before her arrest, she received a phone call from her friend Elisa. Caruto testified she told Elisa that, the next day, she would be in Mexicali, a town in Mexico contiguous to Calexico, the town in California in which Caruto lived. Caruto testified that Elisa asked, "[A]re you still selling the truck? And I said, yes. And then she said, because my brother-in-law wants to buy it." When asked if Elisa had ever seen the truck before, Caruto testified, "Three weeks before this happened, she went to my apartment in Calexico, and she borrowed it and took it to — they went to move some stuff in Mexico." Caruto further testified that Elisa's brother-in-law Jose Jimenez had been with Elisa when she borrowed the truck.

Caruto testified that, after she showed Jimenez the truck in Mexicali the next day, he told her he was interested in purchasing it and asked if he could "try it" and if he could take it to a mechanic. Later that afternoon, Jimenez met Caruto to return the truck and told her that he wanted to buy it. Jimenez said that he would pay her $1,000 for the truck right away and he would pay her the rest in Los Angeles. He asked Caruto if she was going to Los Angeles, and she told him that she was going to Calexico. Caruto testified that she did not agree to take the $1,000 and that she was not planning to drive to Los Angeles. Caruto further testified that she had to return to Mexicali to see her doctor at 9:00 the next morning.

Caruto testified that nothing seemed out of the ordinary about the truck. She proceeded to the border. She also testi-

fied that, following her arrest, she attempted to get in touch with Elisa and Jimenez but was not able to reach them. She never heard from them again.

On cross-examination, the prosecutor asked Caruto if she had given her truck to Elisa and Jimenez before the day that she was arrested. She again explained that she had given it to them three weeks earlier but that she had gotten it back that same day. When questioned about Jimenez's offer of $1,000 on the day of her arrest, Caruto testified that he wanted to give her $1,000 "to reserve the car." Caruto also testified, "He didn't want me to drive it to Los Angeles[.] He asked, are you going to Los Angeles." The defense called six other witnesses, all of whom corroborated various parts of Caruto's testimony.

The prosecution began its closing argument by noting that there was no dispute that Caruto was driving the truck or that the truck contained the cocaine. "What is in dispute," the prosecution argued, "is whether the defendant knew that there was cocaine, 75 pounds of cocaine in the gas tank of her truck." The prosecution went on to argue that

> the defendant knew. And how do we know that she knew? Well, let's look at what she said to Agent Kelley and Agent Ballard at the port of entry on the date of her arrest. What did she say about the truck? She said she owned the truck for approximately one year and that she had given it away to unknown individuals — unknown individuals three weeks to a month prior to the date of her arrest, that she got it back that day, the day of her arrest, and was told by these unknown individuals to drive the truck to Los Angeles. Drive a truck loaded with 75 pounds of cocaine in the gas tank to Los Angeles. Ladies and gentlemen, that's how you know. She didn't say that

it was Jose Jiminez,[1] and by the way, here's his phone number because I just spoke to him.

The defense objected, citing *Doyle v. Ohio*, 426 U.S. 610 (1976). The court overruled the objection. The prosecutor continued:

> She didn't say it was Jose Jiminez who gave her the truck, and by the way, here's his phone number because I just spoke to him a few hours ago . . . She didn't say I was selling the truck. No, what she said to agents Kelley and Ballard was that unknown individuals had given her — or had taken her truck three weeks to a month earlier and that she got it back that day and was told to drive it to Los Angeles.

The defense agreed that the central question for the jury to decide was whether Caruto knew that the cocaine was in the truck. However, counsel questioned the credibility of Kelley's testimony regarding Caruto's post-arrest statement, noting the changes he made to his notes following the interview.

In rebuttal, the prosecution argued that Caruto's "statement at the port of entry made no sense, just like her testimony the other day made no sense. She was lying on both occasions." The prosecutor urged the jurors to question why the government did not have a more detailed statement from Caruto. In particular, he argued that the jury should ask,

> Why, at the port of entry, did she not say someone or some unknown person who borrowed my truck is Jose Jiminez, and here's his phone number?[2] . . . Here is his phone number. I just spoke to him, and

---

[1] Throughout the transcript, this name is spelled "Jiminez." In their briefs, both parties spell it "Jimenez."

[2] At this point, the defense again objected based on *Doyle,* and the court again overruled the objection.

this is the man who had my truck but a few hours ago. This is the man who must have put the cocaine in my truck. Why didn't she say that?[3]

Why didn't she say I'm going home to Calexico, and he thinks I'm going home to Calexico? No, she said I was told to go to LA. Her stories don't make sense. Her story didn't make sense at the port of entry. It makes no sense now. Be guided by your reason and common sense. Her testimony doesn't add up.

After the jury left to deliberate, the defense again raised its *Doyle* objection and moved for a mistrial. The court denied the motion.

During the first day of deliberations, the jury sent a note to the court asking "to review Agent Kelley's interrogation report on Ms. Caruto." The jury was not permitted to see Kelley's notes because they had not been received in evidence. After deliberating for approximately one-and-one-half days, the jury found Caruto guilty on both counts of the indictment. The court sentenced Caruto to 168 months' imprisonment.

## II.

We review de novo whether references to a defendant's silence following the administration of *Miranda* warnings violate her right to due process under *Doyle*. *United States v. Pino-Noriega*, 189 F.3d 1089, 1098 (9th Cir. 1999). *Doyle* error requires reversal unless the prosecution demonstrates, beyond a reasonable doubt, that the error was harmless. *United States v. Baker*, 999 F.2d 412, 416 (9th Cir. 1993).

---

[3]Again, the defense objected, and the court overruled the objection.

III.

**[1]** In *Doyle*, the Supreme Court noted:

> "When a person under arrest is informed, as *Miranda* requires, that he may remain silent . . . , it seems . . . that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony."

426 U.S. at 619 (alteration omitted) (quoting *United States v. Hale*, 422 U.S. 171, 182-83 (1975) (White, J., concurring in the judgment)). The Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause." *Id.* Following *Doyle*, this court has held that a "defendant who has received *Miranda* warnings can, thereafter, remain silent without running the risk that the prosecutor will comment upon that fact." *Leavitt v. Arave*, 383 F.3d 809, 827 (9th Cir. 2004) (per curiam) (footnote omitted) (citing *Doyle*, 426 U.S. at 617-18).

In *Anderson v. Charles*, 447 U.S. 404 (1980) (per curiam), the Supreme Court declined to extend *Doyle* to a situation in which the defendant did not invoke his *Miranda* rights, but waived them and gave a post-arrest statement inconsistent with his trial testimony. The Court held, "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Id.* at 408. In *United States v. Ochoa-Sanchez*, 676 F.2d 1283, 1287 (9th Cir. 1982), another case in which the defendant did not invoke his *Miranda* rights, this court held

that the prosecution's probing on cross-examination of the defendant's post-arrest statements that were inconsistent with his trial testimony did not require reversal because the prosecution did not invite a conviction from the defendant's silence.

[2] We address for the first time the application of this line of cases to a situation in which a defendant makes a limited statement and then invokes her *Miranda* rights. Although neither the Supreme Court nor this court has addressed such a circumstance, we hold that the general principles in the existing case law compel the conclusion that *Doyle* prohibits the prosecutor's argument in this case.

In *Charles*, the case in which the Supreme Court declined to extend the reach of *Doyle*, the defendant was arrested while in possession of the victim's car. 447 U.S. at 404. Charles never invoked his *Miranda* rights. Instead, Charles waived his *Miranda* rights and told the arresting officer that he had stolen the car from the street in a specific area. *Id.* at 405. At trial, Charles testified that he had stolen the car from a parking lot approximately two miles from the area he originally identified. *Id.* The Supreme Court found "no unfair use of silence" when the prosecution questioned Charles about the discrepancy in his story, "because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* at 408. In *Charles*, the prosecutor did not question the defendant about, or argue about, an omission. The prosecutor asked only about the conflict between Charles' two accounts of where he stole the car, one at the time of his arrest and the other at trial.

In *Ochoa-Sanchez*, the defendant was arrested when heroin was discovered in his car at a border crossing. 676 F.2d at 1284. At no point did Ochoa invoke his *Miranda* rights. *Id.* at 1286. Rather, he waived his *Miranda* rights and answered a Drug Enforcement Administration agent's questions. *Id.*

The agent testified that Ochoa stated that the car belonged to his friend Angel Ortega; Ochoa had driven to Mexico that morning; and he did not know about the heroin. *Id.* at 1284. In response "to questioning designed to discover where Ortega could be found, defendant told the agent that he lived in an apartment complex in Santa Ana." *Id.*

At trial, Ochoa testified that Ortega had invited him to go to Tijuana with Ortega and his friend. *Id.* at 1285. When they arrived in Tijuana, the three men went to a bar, but Ochoa wanted to leave. Ortega gave Ochoa the keys to the car and told him that he could leave if he wanted to and that Ortega and his friend would find him the next day or the day after to get the car. *Id.* On cross-examination, the prosecutor pointed out that Ochoa had not told the agent that he had been set up by Ortega or that he had just left Ortega at a bar in Tijuana a short time before he was arrested. *Id.* Ochoa responded that the agent "didn't let [him] explain everything," "didn't let [him] speak," and "told [him] to be quiet." *Id.*

The prosecutor argued in closing that Ochoa had not acted as one would expect an innocent person to act because he did not say that he had been set up, that he hadn't been the one to drive the car to Tijuana, or that the owner of the car was at a bar in Tijuana. *Id.* at 1287 n.3. Further, the prosecutor faulted Ochoa's explanation that he did not have an opportunity to tell the agent the complete story. *Id.* The prosecutor asked, "[W]as the reason that he didn't have an opportunity, or that he didn't want agent Murray to know where Jose Angel Ortega was right then." *Id.*

Because Ochoa "did not remain silent in response to Miranda warnings," the court held that any discrepancies between his post-arrest statement and his trial testimony raised a question of credibility. *Id.* at 1286. Therefore, this court held that "the jury is entitled to all the relevant evidence bearing on credibility" and that it was proper for the prosecutor to "probe all post-arrest statements and the surrounding

circumstances under which they were made, including defendant's failure to provide critical details." *Id.* Noting that the "trial transcript reveal[ed] that defendant's version of the events of his trip into and return from Mexico [was] quite different from the version he proposed . . . upon his arrest," the court held that the fact that Ochoa's "statements, taken as a whole, reveal[ed] an *inconsistency*" was sufficient to justify this inquiry. *Id.* at 1286-87 (emphasis added). "Moreover," the court held, "we do not believe the prosecutor was attempting to draw meaning from the defendant's silence. The questioning clearly related specifically to details that defendant offered at trial but failed to reveal at the time of his arrest." *Id.* at 1287. The court summarized its holding:

> Because defendant's trial testimony raised an issue of credibility, which opened to the prosecutor the circumstances of his post-arrest statement, the prosecutor's examination of agent Murray properly revealed the limits of defendant's statement at time of arrest. Similarly, the prosecutor argued vigorously in closing argument about the credibility of defendant's trial testimony, but stopped short of inviting a conviction from his silence.

*Id.* at 1287 (footnote omitted).

Here, we must decide whether the prosecution impermissibly highlighted omissions from Caruto's post-arrest statement resulting from her decision to invoke her *Miranda* rights. For this reason, *Charles* and *Ochoa-Sanchez* are distinguishable. As the *Ochoa-Sanchez* court noted, "[i]f defendant had invoked his right to remain silent in response to *Miranda* warnings, questioning that asked why certain information had not been revealed would have been improper." *Id.* at 1286 (citing *Doyle*, 426 U.S. 610; *Hale*, 422 U.S. 171; *Bradford v. Stone*, 594 F.2d 1294 (9th Cir. 1979) (per curiam)). Similarly, the defendant in *Charles* did not invoke his rights, and the examination that the Court found permissible explored a spe-

cific discrepancy between his post-arrest statement and his trial testimony.

**[3]** In another non-invocation case, this court considered the effect of a defendant's decision not to answer one in a series of questions. In *United States v. Lorenzo*, 570 F.2d 294 (9th Cir. 1978), the court found that such a "non-answer" did not constitute "either a total or a selective revocation of [the defendant's] earlier waiver of his Fifth Amendment rights." *Id.* at 297-98. Therefore, the court held that Lorenzo's declination to respond to a single question could not be attributed to an exercise of his *Miranda* rights and "it was thus not error to allow testimony as to that event." *Id.* at 298. In contrast, Caruto did not simply fail to answer a specific question. Rather, she specifically invoked her *Miranda* rights and stopped the interview altogether. Therefore, her silence with respect to the unasked questions is clearly attributable to her exercise of those rights.

This clear invocation also distinguishes Caruto's case from *United States v. Makhlouta*, 790 F.2d 1400 (9th Cir. 1986), another non-invocation case in which this court held that cross-examination that "emphasized the *inconsistency* between Makhlouta's post-arrest statements and his entrapment defense at trial" did not constitute *Doyle* error. *Id.* at 1403 (emphasis added). In that case, the FBI agent who interviewed Makhlouta following his arrest testified that, after being advised of his *Miranda* rights, Makhlouta

> advised that the substance he had given to Special Agent Miller and myself earlier in the day he knew in fact was heroin. He knew it was wrong; a violation to be doing this. However, he didn't anticipate he would get caught. He wouldn't say where he had gotten the heroin from earlier in the day.

*Id.* Makhlouta did not invoke his *Miranda* rights at any time.

**[4]** In contrast to his post-arrest statement, Makhlouta pro-
ceeded on an entrapment theory at trial. This court found that
Makhlouta's post-arrest "statements do more than neglect to
suggest the defense of entrapment. They in fact offer a single
explanation of his criminal activity . . . that is arguably incon-
sistent with the entrapment defense since it is evidence of
criminal predisposition." *Id.* at 1404. In Caruto's case, it was
what she did not say in her post-arrest statement, not her state-
ment, that the prosecution used to impeach her. Unlike
Makhlouta, Caruto did invoke her *Miranda* rights and did not
offer a post-arrest explanation that conflicted with her trial
explanation.

As the prosecution acknowledged at trial, the alleged
inconsistencies here were omissions attributable to Caruto's
invocation of her *Miranda* rights.[4] For example, the trial court
asked the prosecutor whether Caruto had ever been asked
about selling the truck. The prosecution responded, "I don't
know that the agent necessarily had a chance to. She did
invoke your Honor. But that is a pretty critical detail." When
the district court noted that "there was no follow-up question,
no clarification at all" about Caruto's statement that she was
helping a friend, the prosecution explained, "Well, your
honor, I guess the problem there is, the defendant didn't pro-
vide any clarification. She invoked." Further, on cross-
examination, defense counsel asked Kelley if the identity of
the individuals who borrowed the truck was "unknown"
because Caruto wasn't asked who they were. Kelley
responded, "That's possible."

**[5]** Caruto could not fully explain why her post-arrest state-

---

[4]In addition, one alleged inconsistency, that Caruto was driving to
Calexico and not Los Angeles, was not inconsistent at all according to
Kelley's own revised interview notes. According to Caruto's trial testi-
mony, Jimenez told her that he would pay her for the truck in Los Ange-
les, and according to Kelley's notes, Caruto had stated that she was told
to drive to Los Angeles. These statements are not inconsistent.

ment was not as detailed as her testimony at trial without disclosing that she had invoked her *Miranda* rights. Moreover, the prosecution commented on her failure to explain further what had happened. This is the type of penalty for exercising one's Fifth Amendment rights that *Doyle* prohibits.

**[6]** As stated in *Charles*, the primary inquiry in cases where a defendant waives his or her *Miranda* rights is whether the prosecutor's question or argument is "designed to draw meaning from silence" or instead merely "to elicit an explanation for a prior inconsistent statement." 447 U.S. at 409. The Supreme Court noted that "[e]ach of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version." *Id.* However, the Court held that "*Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case." *Id.* Where, as here, it is a defendant's invocation of her *Miranda* rights that results in the omitted facts that create the difference between the two descriptions, cross-examination based on those omissions draws meaning from the defendant's protected silence in a manner not permitted by *Doyle*.

**[7]** Even in non-invocation cases in this and other circuits, the differences between the post-arrest statement and the trial testimony must be "arguably inconsistent"; mere omissions are not enough to justify cross-examination or argument regarding what was not said at the time of arrest. *See, e.g.*, *Ochoa-Sanchez*, 676 F.2d at 1286 (inquiry allowed where statement "may arguably be inconsistent with the trial story" (internal quotation marks omitted)); *United States v. Laury*, 985 F.2d 1293, 1303 (5th Cir. 1993) (holding that "prosecutor's 'manifest intent' " was to comment on defendant's post-arrest silence where no inconsistencies existed and prosecutor commented on what defendant did not rather than what he did tell authorities); *United States v. Canterbury*, 985 F.2d 483, 486 (10th Cir. 1993) (holding that "questions were not designed to point out inconsistencies" where defendant's

"post-arrest statements [were] not inconsistent with his entrapment defense"); *Bass v. Nix*, 909 F.2d 297, 304 (8th Cir. 1990) (holding that impeachment was based on silence where post-arrest statement did not "conflict in any manner with [defendant's] trial testimony" because the "only relevant post-arrest conduct was his silence"); *United States v. Casamento*, 887 F.2d 1141, 1179 (2d Cir. 1989) (holding that *Charles* does not apply where statement to authorities and testimony on direct examination were not inconsistent). Where a defendant has invoked her *Miranda* rights, it is even more important that the distinction between inconsistency and omission be carefully observed. Here, Caruto's post-arrest statement and her trial testimony were not inconsistent.

**[8]** The prosecutor's argument emphasized omissions from Caruto's post-arrest statement that resulted from her invocation of her *Miranda* rights and thus invited the jury to draw meaning from silence. Therefore, we hold, under *Doyle*, that allowing the argument violated Caruto's due process rights.

## IV.

**[9]** Under the harmless error standard, we must consider whether it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty even without the prosecutor's impermissible argument. *United States v. Hasting*, 461 U.S. 499, 510-11 (1983). "The burden of proving a constitutional error harmless beyond a reasonable doubt rests upon the government." *United States v. Velarde-Gomez*, 269 F.3d 1023, 1035 (9th Cir. 2001) (en banc) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). When addressing comments on silence, we consider in turn three factors, "(1) the extent of comments made by the witness, (2) whether an inference of guilt from silence was stressed to the jury, and (3) the extent of other evidence suggesting defendant's guilt." *Id.* at 1034 (internal quotation marks omitted).

**[10]** With regard to the first factor — the extent of the comments — we note that of the five-and-one-half pages of tran-

script of the prosecutor's closing argument, approximately one-and-one-half pages were used to attack the credibility of Caruto's testimony based on what she did not say in her post-arrest statement. In its rebuttal argument, the prosecution again spent a considerable amount of time discussing the omissions from Caruto's post-arrest statement. The prosecution explicitly argued that Caruto would have told the agent various other things if she were indeed innocent.

**[11]** The government argues, however, that in assessing prejudice, we should not consider most of the prosecutor's discussion of Caruto's omissions. According to the government, Caruto only objected to "two discrete comments" in the prosecutor's closing and rebuttal arguments, so only those comments should be considered in the harmless error analysis. In fact, Caruto entered four objections, all of which were overruled, to the prosecutor's discussion of Caruto's omissions, and those objections were not limited to "discrete comments." We therefore consider the whole of the prosecutor's commentary on Caruto's silence and conclude that it was extensive. The first *Velarde-Gomez* factor is therefore satisfied.

**[12]** As to the second factor — whether the inference from silence was stressed to the jury — we conclude that it was. The parties agree that the central question in this case was whether Caruto knew that the drugs were in her truck. Because she testified at trial and explained how the cocaine could have been placed there without her knowledge, Caruto's credibility became a key issue, as demonstrated by the parties' closing arguments.

**[13]** With regard to the third factor — other evidence of Caruto's guilt — there was some such evidence, but all of it was circumstantial. In addition to the agents' testimony and Caruto's statements, the prosecution presented evidence that the truck could not hold a significant amount of gas and argued that the truck would not have made it to Los Angeles.

However, there was no evidence that Caruto would not have made it to her home in Calexico, where she testified she was going, on the amount of gas in the tank. The prosecution also presented evidence that Caruto had been stopped at the border five months earlier driving a different car that contained a false compartment. The compartment was empty at that time, and there was no evidence that the car had ever crossed the border, before or since. Finally, the government presented testimony and argument that it is unlikely that a drug dealer would use a "blind mule" to carry drugs worth over $1 million dollars.

**[14]** Where the case against a defendant rests on circumstantial evidence and the defendant has "offered 'plausible innocent explanations' . . . 'credibility [is] of utmost importance.' " *Velarde-Gomez*, 269 F.3d at 1035 (quoting *United States v. Foster*, 227 F.3d 1096, 1101 (9th Cir. 2000)). Therefore, a constitutional error that goes directly to the defendant's credibility usually is not harmless where the defendant's theory of the case is plausible, even if it is not particularly compelling. *Id.* The third *Velarde-Gomez* factor therefore supports a finding of prejudice.

**[15]** Further, circumstances surrounding the jury's deliberation demonstrate that the error was not harmless. The jury asked to see a copy of Kelley's written report, demonstrating that it was concerned with Caruto's post-arrest statement. The jury deliberated for approximately one-and-one-half days after only one-and-one-half days of evidence. "Longer jury deliberations 'weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.' " *Id.* at 1036 (quoting *United States v. Varoudakis*, 233 F.3d 113, 126 (1st Cir. 2000)).

## V.

**[16]** In these circumstances, allowing the prosecutor to emphasize the omissions in Caruto's post-arrest statement and

to argue that those omissions were inconsistent with her trial testimony penalized her for invoking her Fifth Amendment right to remain silent. Therefore, we reverse Caruto's conviction and remand for a new trial.[5]

REVERSED and REMANDED.

---

[5]We need not reach Caruto's alternative arguments for reversal.