**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ALFONSO TORRES,
*Defendant-Appellant*.

No. 13-50553

D.C. No.
3:12-cr-04081-JAH-1

OPINION

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued and Submitted
March 5, 2015—Pasadena, California

Filed July 22, 2015

Before: Michael R. Murphy,[*] Ronald M. Gould,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

---

[*] The Honorable Michael R. Murphy, Senior Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

**SUMMARY****

**Criminal Law**

The panel affirmed a conviction for knowingly transporting cocaine across the United States-Mexico border concealed in a specially constructed compartment of the defendant's pickup truck.

The panel held that while some questions may constitute non-hearsay, where the declarant intends the question to communicate an implied assertion and the proponent offers it for this intended message, the question falls within the definition of hearsay. The panel held that the district court therefore properly excluded as hearsay the defendant's testimony about requests made by his friend, whom the defendant claimed was manipulating him into unknowingly carrying drugs across the border by asking him for favors running errands into San Diego.

The panel held that even if the district court erred in sustaining the hearsay objection, the exclusion did not amount to constitutional error, and that exclusion of the testimony about the friend's requests would also have been harmless under the non-constitutional error standard.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Devin Burstein (argued), Warren & Burstein, San Diego, California, for Defendant-Appellant.

Kyle W. Hoffman (argued), Assistant United States Attorney; Laura E. Duffy, United States Attorney; Bruce R. Castetter, Assistant United States Attorney, Chief Appellate Section, Criminal Division, San Diego, California, for Plaintiff-Appellee.

**OPINION**

TALLMAN, Circuit Judge:

Alfonso Torres appeals his conviction for knowingly transporting seventy-three kilograms of cocaine across the United States-Mexico border concealed in a specially constructed compartment of his pickup truck. *See* 21 U.S.C. §§ 952, 960. At his first trial, which ended in a hung jury, the district court permitted Torres to testify that his friend in Tijuana, Fernando Griese, borrowed his truck on several occasions. During this time, Torres alleged the modifications and concealment could have been made to his truck without his knowledge. On retrial, Torres attempted to testify about other requests made to him by Griese, who Torres claimed was manipulating him into unknowingly carrying drugs across the border by asking him for favors running errands in San Diego. The district court, however, precluded this line of questioning as hearsay and irrelevant.

We have jurisdiction under 28 U.S.C. § 1291. We hold that the district court properly excluded Torres's "favors" testimony as hearsay because—although some questions and inquiries may constitute non-hearsay—where the declarant intends the question to communicate an implied assertion and the proponent offers it for this intended message, the question falls within the hearsay definition. But even if the exclusion was error, we find "it is more probable than not that the error did not materially affect the verdict." *United States v. Seschillie*, 310 F.3d 1208, 1214 (9th Cir. 2002). Thus, we affirm.

**I**

**A**

On August 14, 2012, Alfonso Torres drove his Dodge Ram pickup truck through the Otay Mesa, California, Port of Entry from Mexico into the United States using the Secure Electronic Network for Travelers Rapid Inspection ("SENTRI") lane. A SENTRI card holder is allowed to use special entry lanes reserved for pre-screened, trusted travelers. Manning the SENTRI lane that day, Customs and Border Protection ("CBP") Officer Rodolfo Sanchez inspected Torres's documents and returned them; Torres paused, gripped the steering wheel, and then hit the gas. The manner in which Torres paused and stared at him seemed abnormal to Officer Sanchez; and as Torres drove away, Officer Sanchez noticed a space discrepancy between the pickup's bed and the chassis underneath the tailgate door. This prompted Officer Sanchez to enter a "forced secondary referral lookout" on Torres's truck in the CBP computer to alert inspectors the next time he crossed.

Two days later, on August 16, 2012, Torres once again drove through the Otay Mesa Port of Entry. Based on the computer alert, he was referred to secondary inspection for closer examination, including an x-ray of his truck. The x-ray produced a "no scan" as a result of Torres stopping only briefly during the scan. CBP officers then instructed Torres to park in the secondary lot for a manual search. Moments later, CBP Officer Benjamin Joseph approached Torres and asked him to turn off the ignition. Officer Joseph testified that as Torres handed over his keys, his hands were shaking.

In secondary, a drug dog alerted to Torres's truck and, after further inspection, officers found a hole and strings leading to packages underneath the truck bed. Because the hole was not big enough to extract the packages, the officers first attempted to pull out the drugs using a crow bar. When this failed, they lifted the truck bed from the chassis and removed an access panel. Still unable to remove all the parcels, CBP officers then instructed a mechanic to cut another access panel. It took CBP officers about two hours to access the compartment. Ultimately, seventy-three kilograms of cocaine were recovered from the well-hidden compartment in Torres's truck.[1] Installation of the compartment had increased the space between the bottom of the truck bed and the chassis of the truck, which Officer Sanchez had noticed two days earlier. The government's auto expert testified that accessing the cocaine bricks in the hidden compartment required either heavy machinery, such as a car lift, or three to four people to lift the truck bed off the chassis.

---

[1] One officer testified that eighty-eight kilograms of cocaine were found in the truck, but both the Government and Torres agreed it was seventy-three kilograms in their closing arguments.

During Torres's post-arrest interview, he insisted that he had no knowledge of the drugs. Torres stated that he had taken his truck to a mechanic in Tijuana a few months prior to his arrest where modifications could have been made without his knowledge.

**B**

Torres's first trial began on April 9, 2013, but ended in a hung jury. At the first trial, Torres testified that he had left his truck with the mechanic in Tijuana for a month. The mechanic had botched the paint job and then offered to buy the truck from Torres. Torres also testified that he had loaned the truck to his friend, Fernando Griese ("Fernando"), on four different occasions.[2] Torres said that Fernando returned the truck each time meticulously cleaned "inside and out." Fernando last borrowed Torres's truck about a week and a half prior to Torres's arrest. On the day Fernando returned the truck, he asked Torres if he could take Fernando's friend to the D.M.V. near San Ysidro, California, about eight miles from the Otay Mesa Port of Entry. Torres declined. The next day Fernando called making the same request, and Torres declined a second time. Later, Fernando asked Torres to drive his friend to a tire shop in San Diego to pick up some tires. Torres never acted on this request either.

Although at the first trial the Government objected to Torres's testimony as hearsay, at sidebar, Torres argued that he was "not seeking to introduce this for the truth of the matter, but rather for the effect on the listener." The district

---

[2] The transcript of the second trial misspells the last name as Gress, however, both parties' briefs refer to Fernando as Griese.

court overruled the Government's hearsay objection.[3]  After

---

[3] The testimony before and after the Government's initial objection at the first trial was:

> Q.  When Fernando returned the truck to you that day, a week or a week and a half before your arrest, did he ask you anything?
>
> A.  Yes.
>
> Q.  What did Fernando want?
>
> > [Government]: Objection.  Hearsay.
> >
> > The Court:  Sustained.  Sustained.
> >
> > [Defense Counsel]:  Your Honor, may I speak?
> >
> > The Court:  Sidebar.
> >
> > (Sidebar reported; not transcribed herein.)
> >
> > The Court:  One second.  The objection is overruled.  You may proceed.
> >
> > [Defense Counsel]:  I'll just ask my question again.
>
> Q.  What did Fernando want when he returned a week and a half before your arrest?
>
> A.  He asked me if I could do a favor for him.  He asked that if I could pick up a friend, a friend of his.  He wanted me to take him to the D.M.V. because the person did not know where [the] D.M.V. was.  And he asked me if there was like a D.M.V. near San Ysidro, or in San Diego, and I said that, yes, I did know.  So he asked me if I could do him a favor, if I could take a friend of his.  He told me something like he wanted to

further objections, and once it became apparent that Torres declined the favor and never drove to the D.M.V., the district court instructed defense counsel at a second sidebar that "the extent of the examination should be, to the extent it may be permissible, that Fernando asked to take someone to the D.M.V., gave me some instruction, but it didn't happen. That should be it."[4]  The trial ended in a hung jury after a day and

change his license, like change the category, because he wanted to drive another kind of car.

[4] The testimony leading up to the second side bar at the first trial was:

Q.  Did Fernando want you to pick up his friend – Where did Fernando want you to pick up his friend?

[Government]: Objection.  Hearsay.

The Court:  Sustained.  Sustained.

Q.  In your mind, where would you be picking up his friend?

The Court:  Sustained, counsel.

[Government]: Objection.

The Court:  Move on to the reason for the effect on the listener.

Q.  Where was the D.M.V. that you were planning to go to?

A.  It's close to Brown Field. . . [¶]

. . .

Q.  So when Fernando asked you to take his friend to the D.M.V., did he also ask you for anything else?

half of deliberations.

## C

The second trial began June 4, 2013, and lasted two days. It resulted in a guilty verdict. Prior to the commencement of the second trial, Torres moved to permit the challenged "favors" testimony, but the district court excluded Fernando's requests as hearsay and irrelevant. Because the district court was under the impression that Torres had acted on Fernando's directives, it initially thought the testimony would be admissible under the hearsay exception for the effect on the listener. The district court explained the second time around that after listening to the proffered testimony at the first trial, "the court had the Hobson's choice of directing the jury to disregard that entire batch of testimony from the defendant

---

> [Government]: Objection. Leading and calls for hearsay.
>
> The Court: Sustained.

. . .

Q. In your mind, after you took this person to the D.M.V., did you think you would go anywhere else?

A. Yes. He told me –

> [Government]: Objection. Hearsay.
>
> The witness: – that I was going –
>
> The Court: Sustained. Sidebar, counsel.
>
> (Sidebar reported; not transcribed herein.)

because [Torres] didn't tie it up [] to acting on that instruction," or admitting it.

However, since Torres never drove to the D.M.V. or the tire shop, the district court found Torres had actually offered his testimony regarding the inquiries "for the assumption of the truth, for the assumption they are true to build a third-party defense . . . ." It concluded, "if [the inquiries] are not presented for the truth of the matter, or if they don't prove or disprove any facts as the defendant suggests, they are not relevant." In other words, "[a]s the statement is not offered to prove any facts or its truth, it's not relevant." However, Torres was permitted to testify that Fernando had borrowed his truck on four occasions leading up to his arrest.

The other major difference between the first and second trial was the testimony of a defense expert witness—Efren Lapuz, a former special agent with the Drug Enforcement Administration. Although the Government did not present drug trafficking organization ("DTO") "structure" or "modus operandi" evidence in its case-in-chief, Lapuz testified for the defense about the value of seventy-three kilograms of cocaine and where DTOs generally purchased the drug. The district court ruled that Torres had opened the door to DTO "modus operandi" evidence, and the Government then impeached Lapuz on cross-examination about prior testimony from an unrelated trial where he had averred that DTOs rarely utilized "blind mules"[5] because drug traffickers preferred straightforward transactions—"I pay you, you take the risk." The Government also elicited helpful testimony from Lapuz that because border crossings were a point of risk, DTOs

---

[5] A "blind mule" is a person who transports drugs for a DTO without his knowledge or consent.

generally attempted to minimize the number of such crossings with a single load concealed in the vehicle.

On defense re-direct Lapuz testified that drug cartels generally did not care if the courier was unknowing. He testified that cartels like to use a blind mule because it diffuses the risk of compromising the entire organization if he is arrested; it is an inexpensive mode of transporting drugs; and, so long as they can control the transaction on the other side, the cartel has gained something without losing anything. On re-cross examination, the Government questioned Lapuz about whether he had ever heard of a blind mule with a well-hidden compartment transporting drugs, as opposed to magnetic compartments on the undercarriage that are easily removable. Lapuz stated he had not personally seen them, but had heard about it in the media.

On June 6, 2013, after deliberating for approximately two and a half hours, the jury found Torres guilty of one count of importation of cocaine under 21 U.S.C. §§ 952 and 960. The district court sentenced Torres to 132 months' imprisonment. This appeal followed.

## II

We review the interpretation of the rules of evidence de novo, but a district court's decision to exclude evidence for abuse of discretion. *See United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007); *United States v. Castillo*, 181 F.3d 1129, 1134 (9th Cir. 1999). In assessing whether a district court abused its discretion, we first "determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). If so, we then

consider "whether the trial court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.* (internal quotation marks and citation omitted). "We review de novo whether an evidentiary error rises to the level of a constitutional violation." *United States v. Pineda-Doval*, 614 F.3d 1019, 1032 (9th Cir. 2010) (citation omitted).

## A

As a general rule, a party is prohibited from introducing a statement made by an out-of-court declarant when it is offered at trial to prove the truth of the matter asserted. Fed. R. Evid. 801(c), 802. For the purposes of hearsay, a "statement" is defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). The Advisory Committee Note clarifies that the effect of the "statement" definition is to "exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not *intended* as an assertion. The key to the definition [of a statement] is that nothing is an assertion unless intended to be one." Fed. R. Evid. 801 advisory committee's note to Subdivision (a) 1972 Proposed Rules (emphasis added).

Torres alleges that the district court erred in precluding his testimony about Fernando's inquiries because this evidence does not constitute hearsay. We hold that while some questions may constitute non-hearsay, where the declarant intends the question to communicate an implied assertion and the proponent offers it for this intended message, the question falls within the definition of hearsay.

Some of our sister circuits have held that questions or requests are admissible as non-hearsay because questions are not intended to assert anything. *See, e.g.*, *United States v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990).[6] In *Lewis*, for example, after a defendant's drug-related arrest, his pager or "beeper" went off. *Id.* The police officer who confiscated the pager called the number and impersonated the defendant. *Id.* The unidentified person asked: "Did you get the stuff?" and "Where is Dog?" *Id.* At trial, the district court allowed the officer to testify to the questions asked by the unidentified caller over the defendant's hearsay objections. *Id.* The Fifth Circuit determined that "[t]he questions asked by the unknown caller, like most questions and inquiries, are not hearsay because they do not, and were not intended to, assert anything." *Id.* (citations omitted). Thus, *Lewis* held that the implied assertion contained in the caller's question (i.e., defendant was expecting to receive "stuff") was not hearsay

---

[6] *See also United States v. Rodriguez-Lopez*, 565 F.3d 312, 314–15 (6th Cir. 2009) ("[A] question is typically not hearsay because it does not assert the truth or falsity of a fact." (citation omitted)); *United States v. Thomas*, 451 F.3d 543, 547–48 (8th Cir. 2006) ("Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay."); *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 330 (3d Cir. 2005) ("Courts have held that questions and inquiries are generally not hearsay because the declarant does not have the requisite assertive intent, even if the question conveys an implicit message or provides information about the declarant's assumptions or beliefs." (citations and quotation marks omitted)); *United States v. Oguns*, 921 F.2d 442, 449 (2d Cir. 1990) ("Because a question cannot be used to show the truth of the matter asserted, the dangers necessitating the hearsay rule are not present."); *United States v. Long*, 905 F.2d 1572, 1579–80 (D.C. Cir. 1990) ("While [Defendant's] criticism of a rigid dichotomy between express and implied assertions is not without merit, it misses the point that the crucial distinction under rule 801 is between intentional and unintentional messages, regardless of whether they are express or implied.").

because the definition of "statement" in Rule 801(a) "remov[ed] implied assertions from the coverage of the hearsay rule." *Id.* (citation omitted).

Notwithstanding the Fifth Circuit's broad holding in *Lewis*, we think the issue is more nuanced and context specific. It is widely recognized that the grammatical form of a verbal utterance does not govern whether it fits within the definition of hearsay. *See* 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence, § 8.6, at 57 (4th ed. 2013) ("For purposes of the hearsay doctrine [] the term 'assertion' or 'statement' includes questions and imperatives that express or communicate facts or information about acts, events, or conditions in the world. Indeed, such formulations of human expression are as much within the hearsay doctrine as simple declarative sentences."); 4 Clifford S. Fishman & Anne T. McKenna, Jones on Evidence, § 24:13, 168 (7th ed. Supp. 2012) ("An utterance that is in the form of a question can in substance contain an assertion of fact." (quotation marks and citation omitted)).

Other circuits have not foreclosed the possibility that questions can be classified as hearsay. *See, e.g.*, *United States v. Summers*, 414 F.3d 1287, 1299–1300 (10th Cir. 2005). In *Summers*, police arrested defendant Marvin Thomas along with three co-defendants on bank robbery and aiding and abetting charges. *Id.* at 1293. While being led to a police car, one of the co-defendants inquired of the arresting officer: "How did you guys find us so fast?" *Id.* The co-defendant pled guilty, while Thomas proceeded to trial. *Id.* At trial, the district court allowed the police officer to testify about the co-defendant's inquiry under the present-sense impression exception to the hearsay rule. *Id.* at 1298; Fed. R. Evid. 803(1).

On appeal, *Summers* reasoned that, unlike the "innocuous and ambiguous question" in *United States v. Jackson*, 88 F.3d 845 (10th Cir. 1996)—where a police officer spoke with an unidentified person paging the defendant's confiscated beeper, who asked "Is this Kenny?"—in Thomas's case the declarant's intent was apparent. *Summers*, 414 F.3d at 1299–1300. "It begs credulity to assume that in positing the question [the co-defendant] was exclusively interested in modern methods of law enforcement, including surveillance, communication, and coordination. Rather, fairly construed the statement intimated both guilt and wonderment at the ability of the police to apprehend the perpetrators of the crime so quickly." *Id.* at 1300. Thus, the Tenth Circuit held that "Thomas ha[d] met his burden of demonstrating that by positing the question, 'How did you guys find us so fast?,' [the co-defendant] intended to make an assertion." *Id.*

While we have not previously addressed whether questions constitute hearsay, we think "the term 'matter asserted' as employed in Rule 801(c) and at common law includes *both* matters directly expressed and matters the declarant *necessarily implicitly intended* to assert." 30B Kenneth W. Graham, Jr. & Michael H. Graham, Federal Practice & Procedure § 7001 (2014) (emphasis added). Because there may be instances where a party attempts to admit hearsay by cloaking statements under the guise of a question, the focus of the inquiry should be on what the declarant intended to say, whether implied or directly asserted. *See* Fed. R. Evid. 801 advisory committee's note to Subdivision (a) 1972 Proposed Rules; *cf. Long*, 905 F.2d at 1580 ("[T]he crucial distinction under rule 801 is between intentional and unintentional messages, regardless of whether they are express or implied.").

We hold the district court's application here of Rule 801 is not without support or "illogical." *See Hinkson*, 585 F.3d at 1262. Fernando asked: Can you take my friend to the D.M.V.? Torres said no. Fernando asked a second time: Can you take my friend to the D.M.V.? Torres said no. Fernando asked a third time: Can you take my friend to a tire shop? Torres said no. Fernando's intent in asking for Torres's truck on three separate occasions in the span of a week and a half is apparent: Fernando wanted control of Torres's truck on the U.S.-side of the border. In other words, Fernando intended the implied assertion rather than the express one, and Torres offered the questions for this intended implied message to show it was Fernando who was calling the shots and who unknowingly set him up on the drug importation scheme. Thus, Torres offered the statements for the truth of the defense asserted. We hold the district court did not abuse its discretion in finding that Torres offered Fernando's inquiries for the truth of the matter asserted to prove his third-party culpability defense. Thus, the objections were properly sustained on hearsay grounds.

## B

But even assuming that the district court erred, as Torres alleges, a defendant must still prove that the error or defect was prejudicial. *See* Fed. R. Crim. P. 52(a); *see also United States v. Olano*, 507 U.S. 725, 734 (1993) (holding that where the defendant has made a timely objection to an error, Rule 52(a) applies).[7] Under Federal Rule of Criminal Procedure

---

[7] Torres also challenges the district court's finding that his testimony relating to Fernando's inquiries was irrelevant. Fed. R. Evid. 401. Because we find the district court's exclusion under the hearsay rule to be dispositive, we need not reach the issue of relevancy.

52(a), we engage in a "harmless error" inquiry to determine whether the error was prejudicial. *Olano*, 507 U.S. at 734. Torres, however, argues that the district court's exclusion of Fernando's inquiries were not only prejudicial, but constitutional in nature because the trial court prevented him from presenting a complete defense. A constitutional error under Rule 52(a) heightens the government's burden of proof: reversal is warranted unless the error was "harmless beyond a reasonable doubt." *Compare Neder v. United States*, 527 U.S. 1, 7 (1999) (citation and internal quotations marks omitted), *and United States v. Caruto*, 532 F.3d 822, 831 (9th Cir. 2008) (analyzing a constitutional error), *with United States v. Gonzalez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005) (holding that we reverse a non-constitutional error unless there is a "fair assurance" of harmlessness, i.e., "it is more probable than not that the error did not materially affect the verdict"), *and United States v. Edwards*, 235 F.3d 1173, 1178 (9th Cir. 2000) (analyzing a non-constitutional error).

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). This right includes, "at a minimum . . . the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). "When evidence is excluded on the basis of an *improper* application of the hearsay rules, due process concerns are still greater because the exclusion is unsupported by any legitimate state justification." *United States v. Lopez-Alvarez*, 970 F.2d 583, 588 (9th Cir. 1992) (emphasis in original) (citing *Crane*, 476 U.S. at 691–92).

But "not every [evidentiary] error amounts to a constitutional violation." *United States v. Boulware*, 384 F.3d 794, 808 (9th Cir. 2004) (quoting *Lopez-Alvarez*, 970 F.2d at 588) (internal quotation marks omitted). As *Boulware* and *Lopez-Alvarez* make clear, a defendant must demonstrate the erroneous exclusion was important to his defense in order to rise to the level of a constitutional violation. *Id.* For example, in *Lopez-Alvarez* we held that—although the district court misapplied the hearsay rule by cutting short defense counsel's line of questioning furthering a defense theory—the exclusion did not amount to constitutional error because the "testimony sought to be adduced would not have added substantially to the knowledge the jury gained during the course of the trial." 970 F.2d at 588.

Torres's reliance on *United States v. Stever* to support his argument that the evidentiary exclusion amounted to constitutional error is misplaced. 603 F.3d 747 (9th Cir. 2010). In *Stever*, the defendant was indicted for one count of conspiracy to, and one count of the underlying crime of, manufacture of marijuana. *Id.* at 750. In his defense, Stever sought to prove that the marijuana found on an isolated corner of his mother's 400-acre property was the work of a Mexican DTO that had recently infiltrated rural Oregon. *Id.* The district court barred the Government from arguing that Stever conspired with a DTO to manufacture marijuana since it had denied pre-trial discovery regarding Mexican DTOs, but also ruled *sua sponte* that it would not permit Stever to put on third-party culpability evidence regarding Mexican DTOs or "who else might have been involved." *Id.* at 751. The district court precluded Stever from presenting any defense at all. *Id.* at 752. Defense counsel argued that Stever had no involvement but, given the district court's ruling, proffered no affirmative defense, telling the jury only that the

prosecution had the burden of proof. *Id.*; *see also Pineda-Doval*, 614 F.3d at 1032–33 (finding that the exclusion of the evidence "effectively denied the defendant the only argument that he had").

Here, the district court did not preclude Torres from proffering an affirmative defense. During closing arguments, Torres's counsel argued that Fernando or the mechanic probably planted the drugs in Torres's truck. Indeed, Torres testified that Fernando had previously borrowed his truck on four occasions, that Fernando knew where Torres lived, knew where Torres parked his truck, and had the opportunity to make a spare key. Torres also testified about the Tijuana mechanic who kept Torres's pickup for a month and had offered to purchase the truck from Torres after the botched paint job. In other words, additional information about Fernando's requests to take a friend to the D.M.V. or pick up tires from a San Diego tire shop "would not have added substantially to the knowledge the jury gained during the course of the trial." *Lopez-Alvarez*, 970 F.2d at 588. Thus, even assuming the district court erred in sustaining the hearsay objection, we find the exclusion did not amount to constitutional error.

## C

Finally, the exclusion of Torres's testimony about Fernando's requests would also have been harmless under the non-constitutional error standard. A non-constitutional error requires reversal unless there is a "fair assurance" of harmlessness, or stated another way, unless "it is more probable than not that the error did not materially affect the verdict." *Seschillie*, 310 F.3d at 1214 (quoting *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc))

(internal quotation marks omitted). "Review for harmless error requires not only an evaluation of the remaining incriminating evidence in the record, but also the most perceptive reflections as to the probabilities of the effect of error on a reasonable trier of fact." *United States v. Bishop*, 264 F.3d 919, 927 (9th Cir. 2001) (citation and internal quotation marks omitted); *United States v. Oaxaca*, 233 F.3d 1154, 1158 (9th Cir. 2000) (noting "the harmlessness of an error is distinct from evaluating whether there is substantial evidence to support a verdict").

Torres argues that even under the non-constitutional harmless error standard, we should find the error prejudicial simply by comparing what happened in the first trial with Fernando's inquiries (hung jury after a day and a half of deliberations) and what occurred without it in the second trial (guilty verdict in two hours and thirty minutes).[8]  But the record shows another major difference between the first and second trial—the testimony of defense expert witness and former DEA special agent, Efren Lapuz.

---

[8] Torres argues that the improperly excluded evidence "would have bolstered [the] defense" where the "government's case was hardly overwhelming." *United States v. Crosby*, 75 F.3d 1343, 1349 (9th Cir. 1996).  While it may be true that the inquiries would have added to Torres's defense theory, the Government's case here was stronger than in *Crosby*, especially considering the DTO "modus operandi" evidence introduced at the second trial. *See id.* at 1349–50 (concluding that the victim's testimony that defendant punched her was undercut by the fact that she was inebriated the night of the assault, continuously changed her story, and the government proffered inconclusive blood tests). Furthermore, in *Crosby*, the district court completely precluded a third-party culpability defense when it prevented defendant from introducing evidence of the victim's husband's prior domestic violence. *Id.*

While the Government did not present DTO "structure" or "modus operandi" evidence in its case-in-chief, the court ruled that Torres opened the door to such evidence in calling Lapuz to testify about the value of seventy-three kilograms of cocaine and how DTOs purchase and import the drugs into the United States. Consequently, the Government was able to cross-examine Lapuz who had testified about the uncommon use of "blind mules" because drug traffickers preferred straightforward transactions—"I pay you, you take the risk."

While Lapuz also testified about the advantages of using a blind mule in importing cocaine, the strategic decision to call an expert witness and then inadvertently open the door to DTO "modus operandi" evidence undercut Torres's defense that he was an unknowing courier in two ways: (1) the defense expert's testimony highlighted the rarity of using blind mules in the DTO's importation business; and (2) it allowed the Government to ask the expert witness about a recent case where a DTO had easily attached drugs under the vehicle of an unknowing courier using magnets. The Government effectively contrasted the easily removable magnets with Torres's well-hidden compartment, where the truck bed had to be raised in order to hold the storage box and to extract the drugs. None of this "modus operandi" evidence was before the first jury.

Considering "the probabilities of the effect of error on a reasonable trier of fact" in the context of the remaining incriminating evidence, *Bishop*, 264 F.3d at 927, we find "it is more probable than not that the error did not materially affect the verdict," *Seschillie*, 310 F.3d at 1214. It was undisputed at both trials that CBP officers eventually extracted seventy-three kilograms of cocaine from a truck

registered and driven by Torres. Even though it was disputed at trial whether the modifications would have been visible from the rear of the truck to anyone standing behind it, the government proffered sufficient circumstantial evidence of knowledge. To prove knowledge, the Government introduced testimony that Torres's hands were shaking as he handed over the keys during secondary inspection. Two days prior to his arrest, another officer also testified about Torres's "abnormal" behavior. Less weighty but relevant, the Government also introduced evidence that Torres stopped briefly during the x-ray, creating a "no scan," and then inched toward the exit until an officer told him to park his pickup in secondary.

Unique to the second trial, the Government chipped away at Torres's third-party culpability defense because—as Lapuz testified—it was unlikely that a DTO would expose a load of seventy-three kilograms of cocaine to multiple border crossings as this was a point of risk DTOs sought to minimize. Here, because Torres testified that Fernando last borrowed his truck about a week and a half prior to his arrest and Torres crossed the border on three occasions prior to his arrest, but after Fernando returned the truck, Lapuz's testimony about DTOs using blind mules made Torres's third-party culpability defense less credible. The exclusion of Fernando's inquiries, while arguably relevant, became less probative at the second trial with the introduction of the DTO "modus operandi" evidence. Furthermore, the district court could and did properly exclude Fernando's out-of-court statements on hearsay grounds. But even if the district court erred in doing so, any error in excluding Torres's testimony

about Fernando's statements was not constitutional and was harmless.

**AFFIRMED.**