Filed 11/4/25  P. v. Contreras CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D083593 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF007173) |
| ANDREA CONTRERAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Christopher J. Plourd, Judge.  Affirmed and remanded with directions.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Kathryn Kirschbaum and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Andrea Contreras of attempted first degree murder and related offenses following an incident in which she shot her former romantic partner on the I-8 freeway. At a resentencing hearing held during the pendency of this appeal, she was given a total sentence of 20 years to life.

On appeal, Contreras asserts three challenges to the verdict. First, she claims her trial counsel was ineffective for failing to object when the prosecutor presented evidence and argument that assertedly highlighted her silence following *Miranda*[1] warnings, in violation of her right to due process under *Doyle v. Ohio* (1976) 426 U.S. 610, 618 (*Doyle*). We conclude there was no *Doyle* violation, and so we reject the related claim counsel was ineffective due to his failure to object. Second, she claims the trial court prejudicially erred and violated Evidence Code[2] section 352 when it admitted two exhibits that evidenced her work as a prostitute. We find no error with respect to the admission of the first exhibit and no resulting prejudice with respect to the admission of the second exhibit. Third, she claims the cumulative effect of the foregoing errors violated her right to due process, requiring reversal. We find no cumulative error, since we reject all but one of her claims of trial error.

Contreras does not challenge the sentence imposed at resentencing. But she observes, and the People agree, the abstract of judgment does not reflect the trial court's oral pronouncement of her sentence. Accordingly, we affirm the judgment in all respects and remand for the limited purpose of correcting this discrepancy.

---

1     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2     Further unspecified statutory references are to the Evidence Code.

FACTUAL AND PROCEDURAL BACKGROUND

Contreras was charged in an amended information with attempted premeditated murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a); count 1), shooting at an occupied motor vehicle (*id.*, § 246; count 2), and mayhem (*id.*, § 203; count 3). Multiple firearm enhancements were alleged as to counts 1 and 3. (*Id.*, §§ 12022.5, subd. (a), 12022.53, subds. (b), (c), & (d).) As to count 2, Contreras was alleged to have personally and intentionally discharged a firearm causing great bodily injury or death. (*Id.*, § 12022.53, subd. (d).) As to all counts, she was alleged to have personally inflicted great bodily injury under circumstances involving domestic violence. (*Id.*, § 12022.7, subd. (e).) Several aggravating circumstances were alleged as to each count. (Cal. Rules of Court, rule 4.421(a)(1), (2) & (b)(1).) The victim in each count was Jorge C.

I.

*Trial Evidence*

A.   *Prosecution Case*

The crimes alleged in the information arose from a shooting that took place on the I-8 freeway on August 14, 2023. Contreras engaged in a high-speed chase and then shot the driver of the vehicle she was chasing. Jorge, the victim, was her romantic partner. At trial, the prosecution presented testimony from Jorge, a security guard who saw the couple arguing shortly before the shooting, eyewitnesses who were present on the freeway during the shooting, and numerous law enforcement witnesses.

Jorge testified that since 2020, he and Contreras had been in an on-again, off-again romantic relationship, and they had a child together. At the time of the incident, he was living with Contreras, as well as Contreras's

3

cousin and the cousin's boyfriend and child, in an apartment in Yuma, Arizona.

The couple's tumultuous history included incidents of domestic violence. Jorge described several conflicts in which each had harmed the other physically. In September 2022, both of them were arrested—Contreras for assaulting Jorge, and Jorge for violating a restraining order Contreras had obtained against him after he assaulted her. In September 2021, Jorge was arrested for domestic violence following an altercation in which he pushed Contreras. Contreras had also been arrested for committing battery against her aunt.

In December 2022, Jorge gave Contreras a gun—a .38 Special revolver—so she could protect herself and their son. The couple went to a shooting range together at least five times. Jorge described Contreras as a "really good shooter" with a "hell of a[n] aim."

The prosecution presented evidence that on June 15, 2023, a police officer pulled Contreras over while she was driving in Yuma. Contreras was in possession of a .38 Special revolver loaded with six rounds of ammunition. Throughout the vehicle there were expended casings from a gun that was not a revolver. When the officer asked about the casings, Contreras said she had let a relative borrow the vehicle.

Jorge, for his part, owned an assault rifle (variously referred to as an AR-15 or M&P-15) that he kept in a backpack. It consisted of two main parts, an upper receiver and a lower receiver that were held together with pins.[3] Once disassembled, it could be reassembled in a process that involved

---

[3]     An officer explained the lower receiver of an assault rifle is "the part that has the . . . trigger assembly . . . the mechanism that would basically

snapping the receivers together, inserting pins, reloading the chamber, and inserting another pin.  Out of concern for his son's safety, he kept the weapon in its dismantled state so it would not fire or misfunction.

In 2023, Contreras placed an advertisement on a website used for prostitution ads.  On August 11, a person named "Javi" sent Contreras text messages asking if she was willing to travel to his location; Contreras responded with cost information.  On the morning of August 14, they exchanged additional text messages in which they appeared to have "more of a . . . boyfriend/girlfriend conversation."

Jorge denied knowing Contreras was working as a prostitute.  He admitted, however, that he had experienced difficulties within their relationship in the weeks before the shooting.  On July 28, 2023, he was "going through some things with [Contreras]" and was depressed.  He took a photo of himself pointing a gun at the underside of his chin and sent the photo to her.  On August 10, he sent her a text message saying he wanted to die.  Contreras responded by calling him a "pussy."

On August 13, 2023, the couple drove to San Diego with their son and returned home to their Yuma apartment at 9:00 or 10:00 p.m.  At 3:00 or 4:00 a.m., Jorge was awakened by the ringing of Contreras's phone.  He looked through her phone and saw "a lot of texts from different men."  He denied knowing how Contreras was making money and testified he had "no idea that she was seeing other men."

After seeing the text messages, Jorge gave his son a kiss, grabbed his clothes, and put them in his Nissan.  He had already transferred his backpack with the dismantled assault rifle to the front passenger seat of his

---

cooperate with the other [(upper)] receiver and make the weapon fire."  The upper receiver is "the barrel," "the chamber," and "the charging handle."

Nissan the night before. He took nothing of Contreras's from the apartment, but some of her belongings, including a PayPal card, were already in the Nissan. He drove off, intending to return to California and find a job, because he did not think his relationship with Contreras "was going to work out."

Jorge purchased gas with the PayPal card and drove to a house in Yuma. He sent Contreras a text message that said, "It's all good. I'm leaving." In response, Contreras called him several times, but he did not answer. Then she sent him a flurry of text messages in which she called him a thief.

Jorge purchased beer, which he put in a cooler. Then he drove to a dispensary in Winterhaven, California to buy marijuana, arriving minutes before it opened. At 8:00 a.m., he went inside and made a purchase. When he came out, he saw Contreras enter the dispensary parking lot in her car, a dark-colored GMC Yukon (GMC). She pulled in behind his parked Nissan, blocking him from leaving. She "said a lot of mean things," dumped his cooler of beer on the ground, and climbed into his car to retrieve her belongings.

A security guard saw a man and woman arguing in the dispensary parking lot between 8:00 and 8:10 a.m. on August 14, 2023. The situation appeared suspicious because a car was blocking another vehicle. The woman was yelling at the man, who asked the guard for help. The man did not seem intoxicated. After the guard threatened to call the sheriff, the couple got back into their vehicles. The woman backed out and waited for the man to leave. Then, as the man drove off, the woman "went after" him, "like, right behind him[.]" The vehicles were "going fast," and the woman's tires chirped as she exited the parking lot.

6

Jorge testified that as he pulled out of the dispensary parking lot, Contreras followed him in her GMC. He started driving, then saw that Contreras was behind him and getting "very close." He decided to take the I-8 freeway heading towards California.[4] As soon as he entered the freeway, he sped off going up to 110 miles per hour. Contreras followed him. She drove recklessly and pulled "really close" to his tire. It looked to Jorge as though she was attempting to hit the back of his car and cause it to spin out.

There was traffic on the freeway blocking both lanes. Jorge passed it by driving in the emergency lane, but Contreras stayed right behind him and got very close to his bumper. He decided to slow down so she would pass him. He moved into the left lane and stepped on the brakes. As he decelerated in the left lane, Contreras pulled up next to him on his right. He heard a "pow" and then "everything went black." He touched his head, felt gushing blood, and realized he had been shot by Contreras. Jorge testified that he was shot two times, once in his right temple and once behind his ear.

Three bystanders testified about the incident. Robert C. saw a Nissan speeding on the I-8 freeway followed by a black SUV. The two vehicles were "flying," and "the black SUV was just on the [Nissan] Rogue, basically." "It looked like a cat-and-mouse game, basically a tag game." Robert testified that "of course" the driver of the Nissan seemed scared.

Monica M. was driving in the slow lane of the I-8 when she was passed by two cars in the emergency lane to her right. One was light gray, and it was followed closely by a dark-colored GMC. The gray car pulled in front of Monica. The GMC pulled right next to the gray car, and the GMC driver

---

[4]     The I-8 freeway at this location has two lanes running in each direction, a large center median, and a right shoulder bordered by vegetation.

"instantaneous[ly]" shot the driver of the gray car. The driver-side window of the GMC was down, and Monica could see part of a gun through the open window. Monica heard two shots, then the GMC sped away, and the gray car skidded to a stop.

Alexandra M. was riding in a vehicle on the I-8 when she saw a silver midsize SUV and a "dark-colored larger SUV" driving in the emergency lane at high speeds. The dark-colored SUV was "riding up on the back bumper" of the silver SUV and looked like it was trying to run the silver SUV off the road. The silver SUV moved over to the fast lane, and the dark-colored SUV pulled up so the two vehicles were side by side. The driver-side window of the dark-colored SUV rolled down, Alexandra heard two "loud pops," and the dark-colored SUV sped away. The silver SUV immediately stopped functioning and drifted as it decelerated to a stop. The entire incident, from the point when the silver SUV moved into the fast lane until shots were fired and the larger SUV pulled away, happened very quickly, within no more than five seconds.

A California Highway Patrol (CHP) officer arrived at the scene in response to a service call placed at around 8:15 a.m. on August 14, 2023. The caller had reported a "road rage" incident involving shots fired from one vehicle into another. A light-colored vehicle was blocking the right lane of the westbound I-8 freeway. The victim, Jorge, was sitting on the ground, leaning against the vehicle. There was blood pouring from his mouth and nose, and a bulbous protrusion on his temple. Jorge told the officer a friend named "Contreras" shot him with "a .38."

Jorge was transported to a hospital for treatment. One of the bullets had traveled from his right temple across his head behind his eyes, causing

8

him to lose vision in his right eye. His face was fractured and had to be repaired with titanium plates.

The Nissan was photographed, sealed, and transported to a CHP facility, where its interior was searched. Two beer bottles were on the floorboard under the driver's seat. They were unopened; Jorge explained they likely fell when he "braked really hard." There was also a backpack on the front passenger seat. It contained a nonoperational, disassembled AR-15. A small part of the upper receiver called the "s[p]ring forward assist" appeared to be protruding from the top of the backpack. The backpack itself was not oriented "for easy accessibility" by the driver, and the upper receiver itself was "all the way in" the backpack and upside down. To reassemble the gun would have involved removing pins from the lower receiver one at a time and "break[ing] the weapon apart or put[ting] it back together again to really compress it together." An officer with extensive training on AR-15s testified, "[Y]ou cannot put this weapon system together while trying to evade . . . another vehicle and dodge cars."

CHP Investigators Michael Bell and Bradley Search were assigned to investigate the case. Contreras placed a phone call to Bell the day after the shooting. She told Bell that she wanted to know where Jorge was being treated, and she expressed a desire to go see him in person. She did not volunteer that she had been at the scene and was involved in the incident, nor did she say she was the victim of a crime. Bell told Contreras that access to Jorge was restricted to blood relatives, and based on available information she would not be permitted to see him.

The investigators obtained search warrants for Contreras's phone. Data extracted from the phone showed Contreras and Javi exchanged text messages for a "span of time" the morning of August 14, 2023. Contreras

9

stopped texting Javi at 8:06 a.m. She did not respond to him again until 10:21 a.m. At 11:12 a.m., Javi sent a text asking Contreras to pray for him. Contreras responded, "Pray for me too. I fucked up bad."

On August 17, 2023, Contreras was arrested and taken to the Yuma Police Department, where she was interviewed by Investigators Search and Bell. A video of the interview was played for the jury. Search testified that in response to the investigators' questioning, Contreras "made it seem like she was completely separate from the incident, as if she was at home or she was elsewhere," and never said she was "involved" or on the I-8 freeway during the incident.

Investigators searched Contreras's apartment and found .38 caliber ammunition, but no firearm. They also found a set of GMC car keys, but no GMC.

On August 24, 2023, law enforcement located Contreras's GMC. It had been abandoned near Magnolia Avenue in Yuma. The GMC had not been reported as stolen. There were four unfired .38 Special caliber bullets in its center console. Gunshot residue was detected in the GMC's driver compartment.

A map was prepared based on data from Contreras's cell phone. It showed the phone's movements the morning of the shooting. The phone arrived at the marijuana dispensary at 8:06 a.m. It left the dispensary at 8:10 a.m. and drove on a surface street before entering the I-8 westbound at 8:11 a.m. At 8:13 a.m., the phone was near the location where Jorge's car came to a rest on the I-8 freeway. The phone continued westbound to the next off-ramp, then traveled on surface streets and arrived on South Magnolia Avenue in Yuma at 9:06 a.m.

B.   *Defense Case*

The defense presented testimony from Contreras, her sister, and a male roommate.

Contreras testified that she woke up at 6:00 a.m. on August 14, 2023. She saw that Jorge had sent her a text message saying, "It's all good. I'm leaving." He was already gone. She began "blowing up his phone" because he had some of her personal belongings, including her PayPal card.

She left home around 6:50 a.m. After running errands, she drove to the dispensary to buy marijuana, not knowing Jorge would be there. She had already accepted that he left her and was "kind of over the issue." She pulled in behind Jorge so she could retrieve her belongings. As she searched his Nissan for her belongings, he grabbed her arm. He was "really upset." He said, "You want me to fucking kill myself?" Then they "started fighting more." Contreras "was pissed." She saw his cooler of beer and threw it on the ground, thinking he had purchased it with her PayPal card. She believed Jorge was under the influence of cocaine, his drug of choice.

They left after the security guard threatened to call the sheriff. Contreras backed out so Jorge could move his car. She followed him because he had threatened to kill himself. It was not the first time he had threatened suicide, and she wanted "to prevent that from happening." She followed Jorge onto the freeway and drove behind him at 90 to 100 miles per hour so she would not lose sight of him. While she was driving, she was waving her arms and trying to get his attention to "stop him from doing what he said" because she was "concerned."

At one point, Jorge pulled into the fast lane, and she pulled up beside him in the slow lane. He slowed down to 10 or 15 miles per hour; so did she. While driving slowly, she rolled her window down halfway because she was

11

waving at Jorge and wanted to get his attention. She saw him "pointing his gun at [her]." She was shocked. She "ducked in [her] car" and "opened the center console . . . where the .38 was," and then "turned and . . . fired two shots out of [her] window." When she fired her gun, she was "aiming at [Jorge's] car." "[H]e was aiming at [her], so [she] was not trying to get hit." Then she drove away because she was afraid Jorge would shoot her with his AR-15. She did not know she had shot him.

Contreras testified she had been having problems with the GMC since before the incident. After the incident, it started to lose power and then broke down on Magnolia. She left the GMC and went to get her other car, a Nissan Genesis, which was being repaired at an auto shop 10 or 15 minutes away. She got a ride to the auto shop from a stranger. She left her gun in the GMC.

Contreras did not arrange to have the GMC towed away because she had other cars, so she just left it there. At noon, she "hit the jacuzzi," drank and smoked at the house of a friend whose name she could not remember. She and Javi spent that night together in a hotel room. She did not return to her apartment because she was scared Jorge's brother would "hunt [her] down and come after [her]."

Jorge had injured Contreras on several prior occasions, including by punching her in the face and assaulting her when she was pregnant. He had always been depressed and suicidal. On August 10, 2023, Jorge sent her a text message telling her he wanted to die. She was "on one of [her] escort services" at the time. Jorge had driven her to the "service call[ ]" and was waiting to pick her up, and she was taking longer than expected.

The text messages that Jorge saw before the incident were from Javi. Contreras met Javi on an escort call. He paid for her sexual services, and

then their relationship became personal. When she sent Javi the text message saying she "fucked up," she meant she never should have gone after Jorge when he threatened to kill himself.

Contreras's roommate testified that Jorge owned an AR-15 that he carried in a duffel bag. He once saw Jorge "strip the AR[-15] down" in a matter of 10 to 15 seconds. The morning of the shooting, he overheard Jorge saying to Contreras, "I'm going to kill you, bitch."

Contreras's sister testified that during a video call from the hospital, Jorge said he could see with both eyes.

C.     *Closing Arguments*

The prosecutor sought to persuade the jury that Jorge's version of events was true, and Contreras had testified falsely. Contreras's behavior toward Jorge the morning of the incident, including the way she chased after Jorge, was evidence she was angry and had decided to kill him. If Contreras had truly been concerned about Jorge's well-being, she would have called the police or told the security guard to do so. Instead, she chased after him, shot at him, then immediately fled the scene because she was worried about getting caught. Her activities after the incident showed her lack of concern for Jorge. If Jorge had actually removed anything from his backpack, he would not have been able to put it back after getting shot in the head.

Defense counsel argued that it was Jorge who was lying, not Contreras. He told the jury that Jorge was a "thug" and an "oppressor" who had lied about not drinking beer, not being high, and not knowing about Contreras's prostitution. Contreras had wanted to help Jorge, but she had no obligation to retreat once she saw him aim a rifle at her, and she did not aim to kill him. Counsel argued she was truthful in her police interview when she said she learned from Jorge's sister that he had been in an accident on the freeway.

13

## II.

### *Verdict, Sentence, and Resentencing*

The jury convicted Contreras of all counts and found all alleged enhancements and aggravating circumstances to be true.

On January 30, 2024, the trial court sentenced Contreras to a sentence that included an imposed and executed 25 year to life term for the Penal Code section 12022.53, subdivision (d) enhancement allegation attached to count 1.

After Contreras filed a timely appeal, the trial court recalled her sentence pursuant to Penal Code section 1172.1 and imposed a new sentence at a resentencing hearing held on July 2, 2024. The court exercised its discretion under Penal Code section 1385 to strike all of the Penal Code section 12022.53, subdivision (d) enhancement allegations. As to count 1, the court imposed seven years to life for the attempted murder, plus 10 years under Penal Code section 12022.53, subdivision (b), and the low term of three years under Penal Code section 12022.7, subdivision (e). The court imposed determinate terms of five years and four years, respectively, for counts 2 and 3, and stayed them under Penal Code section 654. The total sentence was 20 years to life.

DISCUSSION

I.

*Defense Counsel Was Not Ineffective for Failing To Assert Objections Under* Doyle

Contreras contends the trial court committed prejudicial error under *Doyle*, *supra*, 426 U.S. 610,[5] when the prosecutor (1) presented evidence of her custodial interview, (2) questioned Investigator Search about the interview, and (3) remarked on the interview in his closing argument. Because her trial counsel did not object to this evidence and remark, the People contend, and Contreras does not dispute, her claims of *Doyle* error are forfeited on appeal. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 118 (*Coffman and Marlow*) [claim of *Doyle* violation forfeited by failure to object at trial].) In an effort to overcome the forfeiture and obtain direct review of the asserted errors, Contreras argues her trial counsel's inaction made his performance ineffective. As we will explain, she fails to establish that she is entitled to relief on this basis.

A. *Additional Background*

1. *Custodial Interview*

As mentioned, following her August 17, 2023 arrest, Contreras was interviewed by Investigators Search and Bell. The interview was recorded and transcribed. The recording was played during the prosecution's case-in-chief, and both the recording and the transcript were admitted in evidence.

---

[5] Under *Doyle*, *supra*, 426 U.S. 610, it is a violation of due process to comment at trial on a defendant's exercise of her right to remain silent after having been advised of her rights under *Miranda, supra,* 384 U.S. 436.

15

As the recording was not transmitted with the record on appeal, we base our summary of the interview on the transcript.

At the start of the interview, the investigators introduced themselves to Contreras. They noted that she had spoken to one of them on the phone two days earlier. They asked her the name of her son and discussed the possibility of helping her contact her mother and determine who was caring for her son.

Investigator Search then informed Contreras she was under arrest. She responded, "Oh, okay." Search stated he was going to read Contreras her Miranda rights, and he proceeded to recite each right separately. After reading each right, he asked Contreras, "Do you understand?"; she responded, "Yes," to each of these questions. Then he asked, "[D]o you understand everything that I just asked you?" Contreras responded, "Yes." Investigator Search told her that he and his partner were "looking to learn from your side and what you . . . might know." Contreras responded, "Yeah."

The following exchange ensued:

"[Investigator Search]: Do you remember what day that this, when Jorge got shot?

"[Contreras]: Mmm. . . . Mmm. . . . Maybe it was like the 14th or 15th? I'm not sure.

"[Search]: It was the 14th[.]

"[Contreras]: Oh, okay.

"[Search]: Do you remember around what time or how you found out about it?

"[Contreras]: Um, yeah, through his sister. . . . Um, at first she called me and she was like hey um, have you like seen George or

16

whatever?  We call him like back and forward Jorge and George. Um.

"[Search]:  Mhm.

"[Contreras]:  So, I was like, oh no, what's up?  You know?  And then she was like, um[,] . . . [w]ell, they called my mom that he was in an accident in Winterhaven and I was like oh okay, I'm not sure, like, they're, we're all thinking a car accident at this point.

"[Search]:  Mhm.

"[Contreras]:  And then she calls me later and then she tells me what happened and stuff like that and . . . [y]eah, that's kind of like when I found out.  You know?"

Investigator Bell then asked Contreras, "When was the last time that you had seen George?"  This was the answer:  "I guess before that happened." However, the transcript reflects that Bell, rather than Contreras, was the person who provided the answer.[6]

Contreras asked whether she was under arrest.  Investigator Search confirmed that she was, and that the charge was "for [Jorge] getting shot." The investigators stated they had witnesses and video but did not know her side of the story.

_____

[6]    The transcript used the letter "O" to refer to Investigator Bell and the letter "D" to refer to Contreras.  The transcript records the question-and-answer exchange initiated by Bell as follows:
"O:  When was the last time that you had seen George?
"O:  I guess before that happened."
    As we will discuss, both the prosecutor (in his closing remarks) and Contreras's appellate counsel (in her appellate briefing) have incorrectly characterized the transcript as attributing the response "I guess before that happened" to Contreras.

17

Contreras asked, "There's no way . . . Um . . . I could, um. . . I can talk to my mom, to have my lawyer present here throughout this questioning?" Investigator Bell responded that if she wanted a lawyer, he and his partner would have to stop the interview. Contreras said "[o]kay," then asked, "[B]ut you guys can help me call, talk to my mother? And obtain her phone number?" The investigators attempted to answer these and other questions posed by Contreras about the possibility of obtaining her mother's phone number before proceeding with the interview. They explained they understood Contreras wanted to ask for her mother's opinion, but they could not give Contreras her phone. Contreras agreed she "would like to talk to my mom first" before answering questions and characterized her desire to talk to her mother as a concern about childcare. She stated, "I'm not sure what's gonna . . . happen with my mom and my son, like I just really want to know."

Near the end of this discussion, Contreras stated, "I really want to talk to [my mother] because she has like my attorney like and stuff like that . . . [t]o contact my attorney and stuff." The investigators immediately agreed, saying, "that means you are done with us, right?" Contreras confirmed she did not want to continue without an attorney. Investigator Search explained that he and his partner had continued to talk to Contreras because they "didn't really get a . . . concise yes or no." Then he ended the interview.

2.     *Prosecutor's Questioning of Investigator Search*

The interview recording was played while Investigator Search was on the witness stand. Afterwards, the prosecutor asked Search, "[D]uring this interview with . . . the defendant, you asked her how she found out about it [i.e., the shooting], correct?" Search agreed that he had. The prosecutor asked, "And what did she say?" This question drew a defense objection that the video "speaks for itself," which the trial court sustained. The prosecutor

18

then asked, "Did the defendant tell you at any time she was there on the I-8 freeway during this incident?" The same defense objection, plus an objection the question was "vague as to time," were overruled. Search responded, "No. She never said that she was involved. She never told us that she was a victim of anything. She made it seem like she was completely separate from the incident, as if she was at home or she was elsewhere, but completely detached and uninvolved."

### 3. *Prosecutor's Remarks in Closing Argument*

In his closing argument to the jury, the prosecutor asserted that during Contreras's custodial interview, the investigators asked, "How did you find out about this?" The prosecutor stated: "If you look at that transcript, they also asked, When was the last time you saw the victim? And the defendant clearly answers, like, before this happened, before the incident. She never says during, I was there. I was there on the I-8 freeway. She flat out plays it off like she was never even there. Flat out plays it off like she was never even there."

## B. *Legal Principles*

### 1. Doyle *Error*

If a suspect receives *Miranda* warnings and then invokes her right to silence or an attorney at any time during questioning, that silence cannot be used against her at trial, whether for impeachment purposes or as evidence of guilt during the prosecution's case-in-chief. (*Doyle*, *supra*, 426 U.S. at pp. 617–619; *Coffman and Marlow*, *supra*, 34 Cal.4th at p. 118.)

However, *Doyle* does not apply when a defendant offers exculpatory testimony at trial that is inconsistent with a voluntary post-*Miranda* statement. (*Anderson v. Charles* (1980) 447 U.S. 404, 408 (*Charles*).) "*Doyle* bars the use against a criminal defendant of silence maintained after receipt

19

of governmental assurances.  But *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements.  Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.  As to the subject matter of his statements, the defendant has not remained silent at all." (*Ibid.*)

*Doyle* error is reviewed for harmlessness under the beyond-a-reasonable-doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).  (*People v. Thomas* (2012) 54 Cal.4th 908, 936–937.)

2.  *Ineffective Assistance of Counsel*

Because Contreras's trial counsel failed to object under *Doyle,* and Contreras claims the omission made his performance ineffective, we review the standards governing such claims.  (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)

" 'To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.' " (*People v. Johnson* (2015) 60 Cal.4th 966, 979–980 (*Johnson*).)

"Unless a defendant establishes the contrary, we shall presume that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Centeno* (2014) 60 Cal.4th 659, 674–675 [cleaned up].)  "[W]e give great deference to counsel's tactical decisions." (*Johnson, supra,* 60 Cal.4th at p. 980.)  And "when the record on direct appeal

20

sheds no light on why counsel failed to act in the manner challenged, defendant must show that there was 'no conceivable tactical purpose' for counsel's act or omission." (*Centeno*, at p. 675 [cleaned up].) "The decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335.) "[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)

Thus, to establish on direct appeal that her trial counsel was ineffective, Contreras must show (1) the prosecutor's presentation of her custodial interview, questioning of Investigator Search, or remark in closing argument amounted to *Doyle* error, and (2) the record on appeal discloses no conceivable tactical purpose for her counsel's failure to object under *Doyle*. As we will explain, she fails to do so.

C.    *Analysis*

1.    *Admission of Interview During Prosecutor's Case-in-Chief*

Contreras contends the trial court committed *Doyle* error when it permitted the prosecution to present her custodial interview during its case-in-chief. She argues that she "never waived her Fifth Amendment rights," made a limited statement that was only "partially inconsistent with her testimony," and "referenced a desire to have an[ ] attorney present shortly after being advised." She claims the prosecutor's presentation of the interview therefore penalized her post-*Miranda* silence, and she argues there is no valid basis for concluding her trial counsel had a valid strategic reason for failing to object to its admission.

We are not persuaded. Contreras's assertion that she never waived her Fifth Amendment rights is just that, a bare assertion offered with no

21

explanation or citation to authorities. Her failure to provide a reasoned analysis supported by relevant case authority forfeits the position. (See *People v. Oates* (2004) 32 Cal.4th 1048, 1068, fn. 10 (*Oates*) [declining to address an assertion where the appellant failed to expand on it with argument or citation to relevant authority]; *People v. Hardy* (1992) 2 Cal.4th 86, 150 (*Hardy*) [same]; *People v. Verdugo* (2020) 44 Cal.App.5th 320, 333, fn. 11 (*Verdugo*) ["Issues not adequately developed in an appellate brief are generally deemed forfeited."].)

Moreover, the assertion lacks merit. It is a basic principle of Fifth Amendment jurisprudence that "a suspect who has received and understood the *Miranda* warnings, and has not invoked [her] *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 388–389 (*Berghuis*); see *People v. Lessie* (2010) 47 Cal.4th 1152, 1169 [suspect implicitly waived *Miranda* rights by "willingly answering questions after acknowledging that he understood those rights"].) Here, Contreras expressly confirmed that she understood each of her *Miranda* rights. She then responded to investigator's questioning about when and how she found out about the shooting. She thereby impliedly waived her Fifth Amendment rights; there was no need for an express waiver. (*Berghuis*, at p. 389 [police are not required to obtain a waiver of rights before initiating their interrogation].) Accordingly, it is simply not the case that Contreras never waived her *Miranda* rights during the interview. Because Contreras did not remain silent in response to the investigators' initial questioning, admission of her responses did not implicate *Doyle*. (*Charles*, *supra*, 447 U.S. at p. 408.)

Next, we consider Contreras's assertion that she "referenced a desire to have an[ ] attorney present shortly after being advised." Once a suspect has

waived her *Miranda* rights, she must clearly and unambiguously invoke her rights to silence or to the assistance of counsel in order to stop the interrogation. (*Davis v. United States* (1994) 512 U.S. 452, 459; *Berghuis*, *supra*, 560 U.S. at p. 382; *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1124–1125.) Appellate courts have found suspects' statements expressing the desire for counsel to be ambiguous in a variety of contexts. (See *People v. Roquemore* (2005) 131 Cal.App.4th 11, 24–25 [surveying cases]; *id.* at p. 25 [holding 18-year-old suspect's question, " '[C]an I call a lawyer or my mom to talk to you?,' " was not an unequivocal invocation of the right to counsel].)

Here, Contreras appears to contend her question, "There's no way . . . I can talk to my mom, to have my lawyer present here throughout this questioning?," constituted an invocation of her right to counsel. But the alleged invocation was not effective unless clear and unambiguous. Contreras ignores the requirement of a clear and unambiguous invocation in her appellate briefing. She does not analyze the asserted invocation, describe it as clear and unambiguous or parse its language and explain why we should find it so, or offer authorities that would support us in reaching that conclusion. Again, it is her burden on appeal to demonstrate error through developed arguments set forth in her opening brief. Her failure to present a properly developed argument analyzing the alleged invocation, and explain based on relevant authorities why it was clear and unambiguous, forfeits her apparent claim that her question amounted to an effective invocation of *Miranda* rights. We are not required to consider undeveloped assertions. (*Oates, supra*, 32 Cal.4th at p. 1068, fn. 10; *Hardy, supra*, 2 Cal.4th at p. 150; *Verdugo, supra*, 44 Cal.App.5th at p. 333, fn. 11.)

Further, even if we assume the purported invocation was effective, after making it, Contreras immediately reengaged with the investigators by

23

asking them questions about obtaining her phone, contacting her mother, and determining childcare options. Yet Contreras does not analyze whether or how the admission of her own questions and statements to the investigators, made of her own volition and not in response to coercion or interrogation, could have violated *Doyle*, nor do we independently perceive how their admission could have constituted such a violation. This point, too, is inadequately developed and therefore forfeited. (*Oates*, *supra*, 32 Cal.4th at p. 1068, fn. 10; *Hardy*, *supra*, 2 Cal.4th at p. 150; *Verdugo*, *supra*, 44 Cal.App.5th at p. 333, fn. 11.)

Moreover, although Contreras later clearly invoked her right to counsel when she confirmed she did not want to keep talking to the investigators without her attorney, and the jury was permitted to hear this part of the interview, it is not *Doyle* error merely "to permit evidence that a defendant exercised [her] right to counsel." (*People v. Huggins* (2006) 38 Cal.4th 175, 198.) Rather, *Doyle* error occurs when the prosecutor invites the jury to draw an " 'adverse inference from either the *fact* or the *timing* of defendant's exercise of his constitutional right.' " (*Huggins,* at p. 199, quoting *People v. Crandell* (1988) 46 Cal.3d 833, 878; see *Huggins*, at p. 199 [no *Doyle* error where the prosecutor referred to the fact that the defendant asked for an attorney "only to show that the interview ended after defendant denied any involvement in the victim's death"]; *People v. Hughes* (2002) 27 Cal.4th 287, 332, fn. 4 [no *Doyle* error if "the evidence of defendant's assertion of his right [to counsel was not] offered to penalize defendant by illustrating consciousness of guilt, but instead . . . to demonstrate a plan to destroy evidence"].) As we will explain, the prosecutor did not refer to Contreras's assertion of her right to the presence of counsel or rely on her invocation or subsequent silence to illustrate consciousness of guilt. Accordingly, no *Doyle*

error arose from the admission of the interview, and trial counsel's failure to object to its introduction did not make his performance ineffective.

Moreover, even if we were to agree presenting the interview violated *Doyle*, we would not find counsel's performance deficient. The decision whether to object to evidence is a matter of trial tactics and seldom establishes the incompetence of counsel. (*People v. Lucas* (1995) 12 Cal.4th 415, 444–445.) Importantly, "[r]eviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions." (*Id.* at p. 442.)

The record here fails to make such a showing. To the contrary, it affirmatively discloses that Contreras's trial counsel actively wanted the interview in evidence as a matter of trial strategy. Before trial, counsel provided the court with premarked trial exhibits. The interview transcript was one of them.[7] However, the court held it was inadmissible hearsay when offered by the defense. The prosecutor then revealed that he planned to present the recording and transcript of the complete interview. Defense counsel agreed the interview could "com[e] in," and the court indicated its approval.

It is clear, then, that Contreras's trial counsel wanted the interview in evidence. The record does not demonstrate this strategy had no rational purpose. Counsel appeared to regard Contreras's statements in response to questioning as at least partly consistent with her claim of self-defense, a view that was not entirely unreasonable. Also, the interview largely consisted of Contreras's efforts to contact her mother and arrange care for her

---

[7]  The transcript was proposed defense Exhibit C-1.

son; counsel may have believed those portions would elicit sympathy from the jury, as well as portray Contreras as caring, buttressing her claim she wanted to protect Jorge rather than harm him. Counsel may also have regarded her invocation of her right to counsel as relevant for benign reasons, such as to show how the interview ended. Finally, since the trial court was unwilling to admit the interview during the defense case, counsel had a rational reason for agreeing to its admission during the prosecution's case-in-chief.

2.  *Prosecutor's Questioning of Investigator Search*

Next, we address Contreras's claim that her counsel was ineffective for failing to object under *Doyle* to the prosecutor's questioning of Investigator Search.

Whether the questioning violated *Doyle* depends on whether, in context, the prosecutor was merely exploring Contreras's prior inconsistent statements or improperly penalizing her for her post-*Miranda* silence. Only the latter violates *Doyle*. (*Charles*, *supra*, 447 U.S. at p. 408.)

In *Charles*, the defendant faced murder charges after a car he was driving was connected with a homicide victim. He waived his *Miranda* rights and told police he stole the car from one location. (*Charles*, *supra*, 447 U.S. at pp. 404, 405.) At trial, he testified he stole the car from a second location. On cross-examination, the prosecutor elicited that defendant could see the second location from the county jail and suggested this was how the defendant " 'got the idea to come up with the story' " he took the car from that location. (*Id.* at p. 405.) The prosecutor asked: " 'Don't you think it's rather odd that if it were the truth that you didn't come forward and tell anybody at the time you were arrested, where you got that car?' " (*Id.* at p. 406.) The defendant said he did not. The prosecutor then asked the defendant whether,

26

when he was first arrested, he told a detective that he stole the car from the first location. The defendant responded that the only time he said this was " 'on tape' " when two other detectives were present. (*Ibid.*)

The Sixth Circuit Court of Appeals approved the latter part of the prosecutor's questioning, reasoning it addressed prior statements that were inconsistent with the defendant's trial testimony. (*Charles*, *supra*, 447 U.S. at pp. 407–408.) However, it held that the initial part of the exchange concerned the defendant's " 'failure to tell [arresting] officers the same story he told the jury,' " and therefore violated *Doyle*. (*Charles*, at p. 407.)

The United States Supreme Court reversed. It stated that while *Doyle* "bars the use against a criminal defendant of silence maintained after receipt of governmental assurances," it "does not apply to cross-examination that merely inquires into prior inconsistent statements." (*Charles*, *supra*, 447 U.S. at p. 408.) While the appellate court had disapproved a portion of the prosecutor's examination, reasoning it asked about postarrest silence, the Supreme Court disagreed the examination could be "bifurcated so neatly." (*Ibid.*) The high court reasoned the examination, taken as a whole, did not refer to the defendant's exercise of his right to remain silent; rather, it asked the defendant why, " 'if [his trial testimony] were true, he didn't tell the officer that he stole the decedent's car from the [second location] instead of telling him that he took it from [the first location].' " (*Id.* at pp. 408–409.) The court stated: "Each of [the] two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case." (*Id.* at p. 409.)

27

Contreras argues that we should not follow *Charles* because the prosecutor's questioning in that case addressed a statement that was inconsistent with the defendant's trial testimony. She asks instead that we follow two Ninth Circuit Court of Appeals cases: *United States v. Caruto* (9th Cir. 2008) 532 F.3d 822 (*Caruto*) and *United States v. Ramirez-Estrada* (9th Cir. 2014) 749 F.3d 1129 (*Ramirez-Estrada*).

The defendant in *Caruto* was arrested at the Calexico port of entry when packages of cocaine were discovered in the gas tank of the truck she was driving. (*Caruto*, *supra*, 532 F.3d at pp. 824–826.) After her arrest, she waived her *Miranda* rights and agreed to make a statement; the only record of the interview was the handwritten notes of an agent. After talking for several minutes, Caruto invoked her right to counsel. (*Caruto*, at p. 824.)

Caruto was tried on charges of cocaine possession and importation. (*Caruto*, *supra*, 532 F.3d at p. 824.) The central issue at trial was whether she knew the cocaine was in the truck. (*Id.* at p. 826.) The prosecution presented testimony from one of the interviewing agents. The agent testified Caruto stated she lent her truck to " 'unknown individuals in Mexicali three to four weeks prior to her arrest,' " she " 'received the vehicle on that date and . . . was going to drive the vehicle to Los Angeles' " and she " 'believed she was helping her friend.' " (*Id.* at p. 824.) On cross-examination, the agent agreed his notes showed Caruto said she was " 'told' " to drive to Los Angeles, and they did not say whether the persons involved were unknown to her or to the agent. (*Id.* at p. 825.)

Caruto then testified that the night before her arrest, a friend had asked her whether she would be in Mexicali and whether she was still planning to sell her truck. (*Caruto*, *supra*, 532 F.3d at p. 825.) When Caruto responded affirmatively, the friend said a relative wanted to buy it. Caruto

28

showed the truck to the friend's relative, who took it to a mechanic and then expressed a desire to purchase it. He offered Caruto money and asked if she was going to Los Angeles, but she refused the money and said she was going to Calexico. (*Ibid.*) In closing argument, the prosecutor told the jury to consider why, when questioned at the port of entry, Caruto failed to mention the relative, provide his phone number, or tell agents she had just spoken to him, and why she did not inform the agents that she was going home to Calexico. (*Id.* at pp. 826–827.)

The Ninth Circuit Court of Appeals held the prosecutor's argument violated *Doyle*. Approaching the issue of a mid-interview invocation of *Miranda* rights as one of first impression, it surveyed cases, including *Charles* and related Ninth Circuit cases, that involved no invocation of rights. (*Caruto, supra*, 532 F.3d at pp. 828–831.) *Caruto* provided the following interpretation of the analytical framework established by these cases: "As stated in *Charles*, the primary inquiry in cases where a defendant waives his or her *Miranda* rights is whether the prosecutor's question or argument is designed to draw meaning from silence or instead merely to elicit an explanation for a prior inconsistent statement. The Supreme Court noted that each of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version. However, the Court held that *Doyle* does not require any such formalistic understanding of 'silence,' and we find no reason to adopt such a view in this case. Where, as here, it is a defendant's invocation of her *Miranda* rights that results in the omitted facts that create the difference between the two descriptions, cross-examination based on those omissions draws meaning from the defendant's protected silence in a manner not permitted by *Doyle*." (*Id.* at pp. 830–831 [cleaned up].)

29

*Caruto* reasoned that, consistent with *Charles*, "mere omissions are not enough to justify cross-examination," whereas an inconsistency between a defendant's post-*Miranda* statements and trial testimony may be used for impeachment. (*Caruto, supra*, 532 F.3d at p. 831.) The court found that Caruto's post-arrest statement and her trial testimony "were not inconsistent," and the prosecutor's argument emphasized omissions from her statement "that resulted from her invocation of her *Miranda* rights and thus invited the jury to draw meaning from silence." (*Ibid.*) Accordingly, the argument violated *Doyle*.

In *Ramirez-Estrada*, the Ninth Circuit followed *Caruto* in a case involving charges the defendant had attempted illegal reentry into the United States following deportation. (*Ramirez-Estrada, supra*, 749 F.3d at pp. 1132–1133.) After being arrested and receiving *Miranda* warnings, the defendant immediately invoked his right to counsel. (*Id.* at p. 1132.) At trial, the defendant testified that he approached the port of entry to seek help from federal officials for a jaw injury, not to reenter the United States. The prosecution then sought to impeach him by presenting evidence that after the defendant invoked his rights, an officer asked him routine booking questions, including whether he had any health problems, "like a heart condition, diabetes"—and answered them without mentioning a jaw injury. (*Id.* at pp. 1132–1133.) The prosecutor then highlighted the omission in closing argument. (*Id.* at p. 1133.)

The Ninth Circuit reversed the defendant's conviction. (*Ramirez-Estrada, supra*, 749 F.3d at p. 1138.) It reasoned that "*Caruto* highlighted two crucial factors that trigger *Doyle*: (1) a defendant's *invocation* of his right to remain silent and (2) an *omission* in post-*Miranda* statements arguably inconsistent with his trial testimony." (*Id.* at p. 1134.) It held, however, that

30

a "*direct* inconsistency" between post-*Miranda* statements and trial testimony may be used for impeachment. (*Ramirez-Estrada*, at p. 1134.) It reasoned the officer had used " 'health problems' " to refer to "potentially life-threatening conditions, 'like a heart condition or diabetes,' " and the defendant's jaw injury was not such a condition. (*Id.* at p. 1135.) It was therefore not directly inconsistent for him to omit the jaw injury in response to the booking question yet claim at trial he was suffering from a jaw injury. (*Id.* at pp. 1135–1136.) Instead, the only significance of his answer to the booking question was in what he did not say. Accordingly, the prosecution had impermissibly sought to impeach him with his post-*Miranda* silence, violating *Doyle*. (*Ramirez-Estrada*, at pp. 1136–1137.)

Turning back to this case, we are not persuaded the prosecutor's questioning violated *Doyle*. First, the discrepancies between Contreras's post-*Miranda*, pre-invocation statements and her trial claim of self-defense involved a direct inconsistency, such that they do not run afoul of the holdings of *Caruto* and *Ramirez-Estrada*. (*Caruto*, *supra*, 532 F.3d at p. 831; *Ramirez-Estrada*, *supra*, 749 F.3d at p. 1134.) The questions to which Contreras responded during her custodial interview were whether she could remember the day Jorge got shot and whether she "remember[ed] around what time or how [she] found out about it[.]" Her response to the latter question was relatively lengthy; it spanned nine lines of the interview transcript. Contreras stated, "Um, yeah, through [Jorge's] sister," and then proceed to describe conversations between herself and Jorge's sister. Contreras told the investigators that "at first" Jorge's sister called her and asked her whether she had seen Jorge, and that she had responded, "oh no, what's up?" Contreras stated Jorge's sister had informed her "he was in an accident," and that Contreras, hearing this, stated to the sister, "oh okay, I'm

31

not sure." Contreras told the investigators, "[W]e're all thinking a car accident at this point. [¶ . . . ¶] And then she calls me later and then she tells me what happened and stuff like that. . . . Yeah, that's kind of like when I found out."

These statements were directly inconsistent with Contreras's trial claim of self-defense because they affirmatively portrayed her as someone who lacked any direct knowledge of the shooting, when her theory of self-defense was that she was not only present at the scene of the shooting but was the person who shot him. Indeed, Contreras herself acknowledges as much in her appellate briefing; she describes her statements as "inferentially denying any involvement in the shooting." Although she later posits that the statements were consistent with her trial claim that she did not initially "believe her shots had hit [Jorge]," we are not persuaded this is a reasonable interpretation of the statements as a whole. The statements conveyed ignorance about all aspects of the incident, not merely whether her gunshots had hit Jorge.

Moreover, it is apparent from the record the prosecutor's questions were directed at Contreras's inconsistent statements, not her post-*Miranda* silence. (*Charles*, *supra*, 447 U.S. at p. 407.) The prosecutor began his questioning by asking Investigator Search whether, during the interview, he "asked [Contreras] how she found out about it[.]" He then asked, "And what did she say?," clearly referring to the content of her response. It was only after defense counsel successfully objected that the prosecutor asked instead whether Contreras said "at any time she was there on the I-8 freeway during this incident[.]" The phrase "at any time" was arguably ambiguous in that it could be taken to refer to the content of Contreras's response as well as her subsequent silence. However, when we consider the examination as a whole

32

(*Charles*, at pp. 408–409), including how the prosecutor introduced the topic, we conclude he was attempting to elicit information about the content of Contreras's statements rather than to "draw meaning from silence" (*id.* at p. 409).

Because Contreras fails to persuade us the prosecutor's questioning constituted *Doyle* error, she also fails to persuade us her trial counsel performed ineffectively by failing to object to the questioning under *Doyle*.

3.      *Prosecutor's Remarks in Closing Argument*

Last, we consider and reject Contreras's claim that the prosecutor's remarks in closing argument violated *Doyle* and amounted to misconduct. As mentioned, in the challenged section of the prosecutor's argument, he told the jury the investigators had asked Contreras, "How did you find out about this?" The prosecutor stated: "If you look at that transcript, [the investigators] also asked, When was the last time you saw the victim? And *the defendant* clearly answers, like, before this happened, before the incident." (Italics added.) He stated further that Contreras "never says during, I was there . . . on the I-8 freeway" and she "play[ed] it off like she was never even there."

In her opening brief on appeal, Contreras, like the prosecutor, adopts the view that it was she who answered the question, "When was the last time you saw the victim?" She contends the prosecutor's argument violated *Doyle* because "apart from [her] denial of involvement" in response to interrogation, her answers to the interviewers' questions were not inconsistent with her trial testimony. She argues the prosecutor's closing argument therefore improperly emphasized "unasked questions and [her] post-invocation silence."

As we have mentioned, however, the interview transcript reflects that Investigator Bell, not Contreras, answered the "When was the last time you saw the victim?" by stating, "I guess before that happened."[8] We see two possibilities: either Contreras is correct, and she answered the question; or the transcript is correct, and the question was answered by Bell.

In either case, no *Doyle* violation has been established. Assuming Contreras answered the question, the prosecutor's argument was appropriately directed at the content of her response. The statement that she "guess[ed]" she last saw Jorge "before that happened" tended to convey noninvolvement and absence from the scene and was therefore directly inconsistent with Contreras's trial theory of self-defense, which portrayed her as a participant in the freeway chase and the perpetrator of the shooting. The defense theory specifically relied on Contreras having seen Jorge *during* the incident when he pointed his weapon at her, rather than "*before*" the incident. (Italics added.) The argument highlighted these direct inconsistencies rather than omissions attributable to Contreras's subsequent silence.

If the transcript is correct, and the answer was provided by Investigator Bell and not Contreras, then no *Doyle* violation has been established because Contreras does not address this scenario in her opening brief on appeal. This briefing omission forfeits the issue. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408 [deeming argument "forfeited by the failure to raise it in the opening brief"]; *People v. Halim* (2017) 14 Cal.App.5th 632, 644, fn. 8 [" '[i]ssues do not have a life of their own: if they

---

8      As the interview recording was not transmitted to this court, we are not in a position to check the transcript's accuracy.

are not raised or supported by argument or citation to authority, we consider the issues' " forfeited].)

Once again, because Contreras fails to establish the prosecutor's closing remarks constituted *Doyle* error, we reject her related contention that her trial counsel was ineffective for failing to object on that basis.

II.

*The Trial Court Did Not Err by Admitting Exhibits That Evidenced*
*Contreras's Engagement as a Prostitute*

Contreras contends the trial court prejudicially erred and violated section 352 when it admitted two prosecution exhibits that showed she had been engaged in prostitution. The challenged exhibits are text messages between Contreras and Javi, and an online advertisement for her services in a publication called Mega Personals. We conclude that Contreras fails to show error with respect to the first exhibit and fails to demonstrate prejudice with respect to the second exhibit.

A. *Additional Background*

Before trial, the prosecution moved to admit (1) text messages between Contreras and Javi on August 11 and August 14, 2023 (the date of the incident), and (2) a "Mega Personals" advertisement.[9] The prosecution argued that Contreras's activities as a prostitute were relevant to her state of

---

[9] The advertisement was admitted as People's Exhibit 12. It prominently displayed, under the heading "928VEGANVIXENBABY," a photo of a woman (identified at trial as Contreras) wearing lingerie and positioned on her hands and knees. As admitted, the photo was redacted so most of Contreras's body, but not her face, was covered by two large, overlapping black rectangles. The text of the ad included a phone number and "SC" (SnapChat) information, as well as statements offering a "clean and respectful gentlemen . . . [a] unique experience" but "no AA."

35

mind at the time of the shooting, including because they showed she deliberately placed herself in dangerous situations and invited risks to her personal safety, which was inconsistent with her theory of self-defense. It argued the text messages, which showed her evolving relationship with her prostitution client, Javi, were relevant to her motive for shooting Jorge, including because they were the messages Jorge saw the morning of incident, prompting him to leave Contreras, which angered Contreras and led her to shoot Jorge in the head on the I-8 freeway. Texts that Contreras sent Javi after the shooting were also relevant, the prosecution argued, because there was a two-hour gap in her messages to Javi that coincided with the time of the shooting, and because after the shooting, she told Javi she "fucked up" and asked him to book a hotel room so they could "chill."

The defense objected to the text messages on the ground they were hearsay and irrelevant. After confirming these were counsel's only objections to the text messages, the trial court overruled them. The court reasoned the messages included Contreras's admissions, and the messages were "very relevant" in that they showed she "was in the process of developing another relationship while breaking up with the victim in this case who ends up with a bullet in his head." The court stated, "[T]he dynamics of all that is . . . relevant to the jury to determine what happened, what didn't happen."

As for the Mega Personals advertisement, the defense objected that it was inadmissible under section 352. The prosecutor responded that the ad was relevant as state of mind evidence, and because it showed Contreras's moniker "Vegan Vixen" as well as her cell phone number, thus tying her to the phone used to send text messages to Javi. Defense counsel offered to stipulate the phone number in the ad was that of Contreras. The trial court tentatively ruled the advertisement appeared to have little probative value

36

and "some" prejudicial effect but told the prosecution it would consider allowing the exhibit to be used for impeachment.

Before the officer who provided foundation for the text messages and advertisement took the stand at trial, the prosecutor advised the trial court that the parties had been unable to reach a mutually acceptable stipulation.[10] The court stated that if there was no stipulation or only a partial stipulation, it would reconsider its initial ruling, the prosecution could present its evidence, and the court would rule on any objections.

Later, the parties revisited the issue of the advertisement's admissibility. Defense counsel again objected under section 352. He argued the exhibit was not relevant, and any relevance it possessed was outweighed by its potential for prejudice, which was great because Contreras's prostitution would likely be "looked down upon" by jurors.

The trial court overruled the objection. It found the advertisement was "logically relevant and it's highly probative." It reasoned the image in the photograph tended to confirm Contreras's identity as the defendant. The court acknowledged there was "some prejudice" because of the nature of the photograph, but found the advertisement nevertheless provided relevant context. The court explained: "In other words, as I understand it, she's with Jorge . . . for a number of years. They have a child together. This is okay with him, apparently. In other words, it puts into context how these people are in a relationship together that . . . all of a sudden he decides, no, this is not going to be any good anymore."

---

[10]     The impasse appeared to be that whereas the prosecutor had proposed a stipulation that covered Contreras's phone number as well as her social media moniker and associated foundational facts, defense counsel was only willing to stipulate to Contreras's phone number.

B.    *Legal Principles*

Under section 352, a court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  " 'Prejudice for purposes of . . . section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues, not evidence that is probative of a defendant's guilt.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 133 (*Valdez*).)  "We review a trial court's ruling under this section for abuse of discretion and will reverse a trial court's exercise of discretion to admit evidence 'only if the probative value of the evidence clearly is outweighed by its prejudicial effect.' " (*Ibid.* [cleaned up].)

C.    *Analysis*

1.    *Text Messages of Contreras and Javi*

Contreras contends the trial court erred and violated section 352 as well as her right to due process by admitting evidence of the text messages she exchanged with Javi.  She asserts there was no relevance in the fact she initially met Javi as a prostitution client, and the only salient point the messages established was that Jorge "became upset when he realized [she] was involved with another man."  She observes that the messages showed that by August 14, 2023, her relationship with Javi had become "an intimate, romantic connection," such that it was "actually misleading to reveal how they'd first met."  She acknowledges, however, that at least one of her post-shooting texts to Javi was relevant and admissible.  She asserts that "a proper ruling would have . . . limited [Jorge's] testimony regarding the reason for his abrupt departure to the fact of an argument on the morning of August

38

14th, and permitted the presentation only of her text to Javi after the shooting, in which she admitted she'd '. . . fucked up bad.' "

Contreras fails to establish the trial court erred. We first note that she acknowledges in her opening brief on appeal the only objections raised to the admission of the text messages at trial was that they were hearsay and irrelevant. She nevertheless asserts on appeal that the court erred when it admitted all of her text messages with Javi, except for the text stating she "fucked up," because they were unduly prejudicial under section 352. There are two difficulties with her appellate argument. First, hearsay and relevance objections are not sufficient to preserve an appellate challenge under section 352. (*People v. Escobar* (2000) 82 Cal.App.4th 1085, 1103, fn. 11 [hearsay objection did not preserve for appeal claim of undue prejudice under § 352]; accord, *People v. Ervine* (2009) 47 Cal.4th 745, 777 [citing *Escobar*]; *Valdez*, *supra*, 55 Cal.4th at p. 138 [relevance objection did not preserve for appeal claim under § 352]; *People v. Champion* (1995) 9 Cal.4th 879, 913 (*Champion*) [same].) Second, although Contreras faults the trial court for failing to limit the admitted text messages to just one, she does not point to any instance when she asked the court to impose such a limitation on the grounds the messages to be eliminated were "particularly prejudicial." (*Champion*, at p. 914.) "Accordingly, [she] ha[s] not preserved this issue for appeal."[11] (*Ibid.*)

---

[11] We also note that Contreras identifies People's Exhibit 82 as the exhibit the admission of which she is challenging on appeal. However, the People presented her text messages to and from Javi in two separate submissions—Exhibits 13 and 82. Exhibit 13 shows their text messages from August 11, 2023. Exhibit 82 shows the content of their text messages from August 14. At no point, however, does Contreras specify in her appellate briefs that she is challenging the admission of Exhibit 13. We overlook the

In any event, Contreras's challenge to the admission of the text messages also lacks merit. Her essential complaint is that the text messages were unduly prejudicial to the extent they revealed she was involved in prostitution, and Javi was one of her customers. The exclusion of evidence a witness was engaged in prostitution has been upheld on the ground such evidence has the potential to be embarrassing or unfairly discrediting. (See, e.g., *People v. Phillips* (1985) 41 Cal.3d 29, 49–51 (*Phillips*).) However, the weighing required by section 352 "depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.) A trial court's exercise of discretion under section 352 will not be disturbed unless the probative value of the evidence is clearly outweighed by its prejudicial effect. (*Id.* at pp. 1314–1315; *Valdez, supra,* 55 Cal.4th at p. 133.)

Given the unique facts of this case, we are not persuaded the text messages between Contreras and Javi on August 11 and 14, 2023, were clearly more prejudicial than probative. It was undisputed at trial that Contreras shot Jorge; the only dispute was whether she acted deliberately, with premeditation and intent to kill, or whether she acted in self-defense and without the intent to harm Jorge. Thus, the jury was tasked with determining Contreras's mental state, a matter generally proven with circumstantial evidence. (*People v. Thomas* (2011) 52 Cal.4th 336, 355.)

Determining Contreras's mental state was particularly challenging in this case. The shooting occurred during a domestic dispute, both participants appeared to be less than reliable narrators, and they provided conflicting

omission, however, because her appellate arguments are broadly directed at all evidence of her text communications with Javi.

40

explanations for their actions. To ferret out their respective intentions, the prosecution as well as the defense delved into the couple's complicated history, including their disputes from years earlier and their activities in the days and moments leading up to and after the shooting.

Contreras's text messages with Javi showed that what began as a financial transaction on August 11, 2023 had turned into a personal, romantic relationship by August 14. The messages tended to explain the motivation for Jorge's decision to suddenly leave Contreras on the morning of the shooting. They also contextualized the ensuing dispute and provided revealing information about Contreras's mental state during and after the shooting. As the trial court explained, the messages were "very relevant" because they showed Contreras was "in the process of developing another relationship while breaking up with the victim in this case who ends up with a bullet in his head."

With respect to prejudice, although the messages from August 11 discussed a financial transaction and arrangements to meet, such that they tended to show she was a prostitute, they were devoid of salacious content or discussion of sexual activity. And as Contreras acknowledges, the messages from August 14 evidenced a personal relationship, not a professional one. Thus, on the whole the messages were not exclusively focused on prostitution, and their content was not prurient or degrading.

And although the fact Contreras was working as a prostitute was arguably inflammatory, it was no more inflammatory than the evidence concerning the charged crimes, a circumstance that decreased the potential for prejudice. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405 (*Ewoldt*) [holding the potential for prejudice under § 352 was decreased where evidence of the defendant's uncharged acts was "no more inflammatory than

41

the testimony concerning the charged offenses"].) Nor was it more inflammatory than the evidence the defense was permitted to present against Jorge, which included that he assaulted Contreras while she was pregnant, was a cocaine addict, and was high on cocaine during the incident.

Contreras contends the prejudice of the messages was unmitigated because the trial court failed to give a limiting instruction to prohibit the jury from misusing the evidence she was a prostitute. She overlooks, however, that the court instructed the jury with CALCRIM No. 200, which states jurors "must not let bias, sympathy, prejudice, or public opinion influence [the] assessment of the evidence or [their] decision." This and similar curative instructions have been held to mitigate the potential for prejudice under section 352. (See *People v. Casillas* (2021) 65 Cal.App.5th 135, 151 [holding the giving of CALCRIM No. 200 mitigated the potential prejudice of evidence of the defendant's status as an illegal immigrant]; *People v. Doolin* (2009) 45 Cal.4th 390, 439 [holding the giving of CALJIC No. 1.00, which instructed the jury "not to be influenced by passion, sympathy, or prejudice," mitigated the potential for prejudice].)

In sum, we are not persuaded the probative value of Contreras's text messages to and from Javi are clearly outweighed by their prejudicial effect. As a result, we conclude the trial court did not violate section 352.

2.    *Mega Personals Advertisement*

Contreras contends the trial court abused its discretion under section 352 by admitting the Mega Personals advertisement, because it had no probative value and was "graphic" and "damaging" and therefore unduly prejudicial. She complains that the prosecution was permitted to amplify the advertisement's prejudice with the testimony of a CHP officer, who explained that the statement "no AA" meant "no African-American," the name

42

Contreras used in the advertisement was "Vegan Vixen," and the advertisement ran from April to August 2023.

The People contend that Contreras's challenge is partly forfeited because she did not object or move to strike when the officer testified about the meaning of "AA" and provided other information about the particulars of the advertisement. Contreras responds that the objection to the advertisement itself was sufficient to preserve her appellate challenge to the officer's testimony. The People have the better argument. The details of the advertisement, including its dates and the meaning of "no AA," were supplied by the officer, not the advertisement itself. Contreras did not object or move to strike this testimony. As a result, she cannot challenge its admission on appeal. (§ 353, subd. (a); *People v. Freeman* (1994) 8 Cal.4th 450, 490.)

As for the trial court's decision to admit the advertisement, we need not address whether the court erred because we conclude any such error was harmless. Contreras argues we should consider the harmlessness of the asserted error under the *Chapman* standard because the admission of the advertisement violated her right to due process under the Fifth and Fourteenth Amendments. She relies on authorities holding the erroneous admission of evidence results in a due process violation if the evidence is so prejudicial or inflammatory its admission makes the trial fundamentally unfair. (*Duncan v. Henry* (1995) 513 U.S. 364, 366; *Estelle v. McGuire* (1991) 502 U.S. 62, 70, 75; *People v. Partida* (2005) 37 Cal.4th 428, 438–439.) We do not find this circumstance to be present here. Although the advertisement was evidence Contreras was working as a prostitute, as we have mentioned, that fact was no more inflammatory than the evidence of the charged crimes or the other facts the defense was permitted to present about Jorge's own illegal behavior. (*Ewoldt*, *supra*, 7 Cal.4th at p. 405.) And although the

photo of Contreras displayed in the advertisement was sexually suggestive, it was redacted by the prosecution, and at the court's direction the area of redaction was increased so it covered most of Contreras's body. The resulting image is of a lingerie-clad woman whose body is almost entirely concealed in large black rectangles that extend from just below her shoulders to the middle of her thighs—an image unlikely to seriously disturb the sensibilities of the average adult. We do not perceive this exhibit to be so degrading or inflammatory that its admission made the trial fundamentally unfair.

Because the asserted error did not result in a federal constitutional violation, the harmlessness of the error is determined according to the *Watson* standard for reviewing errors of state law. (*People v. Boyette* (2002) 29 Cal.4th 381, 428.) The error, if any, was harmless under this standard. The advertisement was a single-page exhibit. As we have just stated, the photo of Contreras was largely redacted. Although it was evidence Contreras was engaged in prostitution, and such evidence has the potential to be unfairly discrediting (*Phillips*, *supra*, 41 Cal.3d at pp. 49–51), here there was not a reasonable likelihood the advertisement caused the jury to unfairly discredit Contreras's testimony. First, the advertisement was not more inflammatory than the other evidence presented to the jury about the crimes themselves or Jorge's own illicit behavior. Second, the prosecutor did not refer to the advertisement or emphasize Contreras's work as a prostitute in his closing argument, nor did he rely on her prostitution to persuade the jury to doubt her credibility.

Third, the defense made strategic use of the evidence during its own case in chief. The defense told the jury (in a deferred opening statement) that Jorge had been untruthful when he testified he did not know what work Contreras was doing. Defense counsel stated Jorge had supported Contreras

44

in her work as an escort, drove her to her appointments, and gave her the .38 caliber gun for her protection. The defense portrayed Contreras's work as a prostitute as the circumstance at the core of Jorge's suicide threats and elicited from Contreras that his threats coincided with instances when he was waiting for her while she was on a service call. Thus, the inferences the jury was asked to draw in favor of and against Contreras's interests were evenly balanced.

Fourth, as we have mentioned, jurors were instructed not to let "bias, sympathy, prejudice, or public opinion" influence their assessment of the evidence or their decision. (CALCRIM No. 200.) Finally, Contreras's version of events was illogical in many respects. On this record, we do not perceive a reasonable likelihood Contreras would have achieved a more favorable outcome at trial had the advertisement not been admitted.

Accordingly, the trial court did not commit prejudicial evidentiary error when it admitted the Mega Personals advertisement.

## III.

### *Cumulative Error*

Contreras contends the cumulative effect of the trial court's evidentiary errors requires reversal of her convictions. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Here, however, we have rejected all but one of her claims of error. As a result, there are not multiple errors to accumulate. (*People v. Weaver* (2012) 53 Cal.4th 1056, 1077.)

IV.

*Clerical Errors in Abstract of Judgment*

Finally, Contreras identifies two errors in the operative abstract of judgment (filed August 9, 2024) that require correction. First, whereas at the resentencing hearing, the trial court struck the Penal Code section 12022.53, subdivision (d) firearm enhancement allegation, the abstract of judgment shows the allegation was stayed. Second, the abstract of judgment reflects only Contreras's indeterminate terms; no abstract was prepared for the stayed determinate terms the court imposed for her convictions on counts 2 and 3.

The parties agree, as do we, that the foregoing discrepancies are correctible clerical errors. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Where there is a discrepancy between the oral pronouncement of sentence and the minute order or abstract of judgment, the oral pronouncement controls. (*Ibid.*) We will remand with directions for the superior court to delete the stricken firearm enhancement and to reflect the stayed determinate terms imposed on counts 2 and 3.

DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court with directions to correct the abstract of judgment to delete the stricken firearm enhancement and to reflect the stayed determinate terms imposed on

counts 2 and 3.  The court should forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.


                                                                    DO, J.

WE CONCUR:


McCONNELL, P. J.


KELETY, J.